The STATE of Ohio, Appellee,

v.

ANDERSON, Appellant.

[Cite as *State v. Anderson,* 154 Ohio App.3d 789, 2003-Ohio-5439.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 01–CA–214.

Decided Oct. 8, 2003.

790

Paul J. Gains, Mahoning County Prosecuting Attorney, and Janice T. O'Halloran, Assistant Prosecuting Attorney, for appellee.

Gary L. Van Brocklin, for appellant.

---

GENE DONOFRIO, Judge.

{¶ 1} Defendant-appellant, Anthony Anderson, appeals from a Mahoning County Common Pleas Court judgment convicting him of three counts of aggravated murder, one count of attempted aggravated murder, and one count of robbery, following a jury trial.

{¶ 2} On November 8, 1998, Youngstown police responded to a call regarding a shooting on Lansdowne Boulevard in Youngstown, Ohio. Upon arriving at the scene, Officer Ron Barber found four-year-old DeShun Moreland dead, lying on a couch with blood and brain matter surrounding him. He then found DeShun's mother, Lashawnda Aziz, dead, lying on a bedroom floor. Lashawnda was five months pregnant at the time, and her unborn child was also dead. Finally, Officer Barber found Lashawnda's three-year-old daughter, Brea Aziz, wrapped in a blanket lying in a pool of blood. Brea was alive. All of the victims had been shot.

{¶ 3} On the evening of the murders, appellant and Kevin Calwise approached Jamar Prieto to borrow a gun. Prieto gave appellant a .38 revolver and saw

appellant give it to Calwise. Appellant and Calwise planned to commit a "lick," the street term for robbery. According to Prieto, appellant asked him to drop them off near Waddell Casey's home. Casey lived with his girlfriend Lashawnda and her children.

{¶ 4} According to Prieto, he dropped appellant and Calwise off near Casey's home and drove around the block, waiting for appellant and Calwise to complete the lick and return to the car. Appellant and Calwise came through a backyard and got back in the car. At the time, appellant had a Glock 9. After returning to the car, appellant gave Calwise some money and the Glock 9. Appellant also returned the .38 to Prieto. Prieto noticed that the gun had been fired.

{¶ 5} Brea survived the shooting and identified appellant as the man who shot her, Lashawnda, and DeShun. She stated that after appellant shot her, she went into the bedroom and covered up with a blanket. Appellant admitted to the police that he knew Lashawnda and her children and that Brea knew him.

{¶ 6} The police recovered evidence from the scene, including numerous nine-millimeter shell casings and a lead slug. Based on information gained during the investigation, Detective Jose Morales searched Prieto's home, where he found a .38 caliber gun loaded with five rounds, a .45 caliber gun, and a nine-millimeter gun. Next, Detective Morales searched Calwise's home. There, he found a box of nine-millimeter rounds and some clothing that matched the description of what the shooters wore during the murders and robbery. Detective Morales also searched appellant's home and recovered weapons and ammunition. It was later determined that the bullets recovered from the crime scene were chemically identical to those found at appellant's house and that they were all from the same melt and made at the same time.

{¶ 7} On November 19, 1998, a Mahoning County Grand Jury indicted appellant and Calwise on three counts of aggravated murder in violation of R.C. 2903.01(B) with death-penalty specifications, one count of attempted aggravated murder in violation of R.C. 2923.02(A) and 2903.01(B), and one count of aggravated robbery in violation of R.C. 2911.01(A), all with firearm specifications.

{¶ 8} Approximately six months after the murders and robbery, Calwise confessed to his role in the crimes. He told police that he and appellant had planned to commit a lick and borrowed a gun from Prieto. He stated that he and appellant went to Casey's home armed with guns. Calwise said that appellant shot Lashawnda, DeShun, and Brea. He admitted that he stood by the door while appellant shot the victims. He also admitted shooting DeShun in the neck, but he said that he thought DeShun was already dead. Calwise further admitted searching the kitchen for drugs and receiving money and a Glock 9 for his part in the robbery.

{¶ 9} Appellant's trial began on October 1, 2001. On October 24, 2001, the jury returned guilty verdicts on all charges. The trial court sentenced appellant on November 2, 2001. The jury recommended sentences of life imprisonment without parole on each of the three murder convictions. The court sentenced appellant to life in prison without parole on each of Counts 1, 2, and 3. On Counts 4 and 5, the court sentenced appellant to ten-year prison terms. Additionally, the court sentenced appellant to three-year prison terms on each of the five firearm specifications. The court ordered appellant to serve all sentences consecutively. Appellant filed his timely notice of appeal on November 29, 2001.

{¶ 10} Appellant raises three assignments of error, the first of which states:

{¶ 11} "It was error to admit the taped confession of Kevin Calwise in evidence."

{¶ 12} At trial, plaintiff-appellee, the state of Ohio, called Calwise as a witness. Calwise refused to testify. This took appellee by surprise. Calwise had already been convicted of the murders and robbery and had testified at his own trial. Even upon the court's order for him to testify, Calwise refused.

{¶ 13} When it became clear that Calwise would not testify, appellee sought to introduce his videotaped confession. Several months after he was arrested, Calwise began to contact Detective Morales. Detective Morales refused to speak with him, telling Calwise that he could not communicate with him without his attorney present. After several requests by Calwise to speak with Detective Morales without his attorney, Detective Morales contacted the prosecuting attorney's office. An assistant prosecutor told Detective Morales that he could speak with Calwise as long as he made clear to Calwise his rights and Calwise knowingly and voluntarily waived those rights.

{¶ 14} Upon this advice, Detective Morales met with Calwise without his attorney present. Calwise was informed repeatedly of his rights and repeatedly waived them. Calwise then gave Detective Morales a detailed account of the robbery and shootings, incriminating both himself and appellant. Calwise stated that he and appellant had a plan to commit a lick and went together to the Lansdowne home. He said that appellant took Lashawnda to a back room and he heard two shots. He also implicated appellant as both Brea's and DeShun's shooter. After appellant shot DeShun, Calwise said, appellant told him to shoot "the little dude." So he too shot DeShun. Calwise contended that he believed DeShun was already dead when he shot him. Calwise also admitted to looking through the kitchen cupboards for drugs and standing watch by the front door. Following the shootings, Calwise said the two ran out of the house to Prieto's waiting car. For his part in the crimes, appellant gave Calwise $1,000 and a Glock 9.

{¶ 15} After giving his confession, Calwise accompanied Detective Morales, Detective Jerry Maietta, and Captain Kane to the Lansdowne home. At the house, Calwise gave a detailed description of how the furniture was arranged and where everyone was on the night of the robbery and shootings. He walked the police through the events of the night, showing them how he looked through the cupboards, where he held his gun, and the path he and appellant took out of the house to the getaway car. This reenactment of the crimes was also videotaped as part of Calwise's confession.

{¶ 16} Appellant contends that the court erred in admitting Calwise's confession. He relies on the United States Supreme Court's statement that a nontestifying codefendant's statements implicating a defendant are presumptively unreliable and their admission violates the Sixth Amendment's Confrontation Clause, citing *Douglas v. Alabama* (1965), 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934, and *Lee v. Illinois* (1986), 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514. Appellant also points to the court's discussion considering the scope of the federal hearsay exception for statements against penal interest. The court stated:

{¶ 17} "In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else. '[T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'" *Williamson v. United States* (1994), 512 U.S. 594, 600–601, 114 S.Ct. 2431, 129 L.Ed.2d 476, quoting *Lee v. Illinois* (1986), 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514.

{¶ 18} In short, only those portions of a statement that directly inculpate the declarant bear sufficient indicia of reliability for admission in evidence. The greater portion of the statement is not admissible against the codefendant.

{¶ 19} Next, appellant points to the court's holding that accomplice confessions that inculpate a defendant are not within a firmly rooted hearsay exception, citing *Lilly v. Virginia* (1999), 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117. Appellant argues that since Calwise's confession was not within a firmly rooted hearsay exception, appellee was required to prove that it contained indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence. He contends that Calwise's statement was not inherently trustworthy. He points out that Calwise had been under arrest for six months before making his statement. He notes that Calwise's attorney had informed Calwise of DNA

evidence linking him to the crime scene. He also contends that the detective who questioned Calwise used leading questions.

{¶ 20} Finally, appellant argues that the trial court applied state law when it should have applied federal law. He asserts that the trial court relied on the self-inculpatory nature of the statement to find particularized guarantees of trustworthiness. This, appellant claims, is prohibited by federal law.

{¶ 21} The admission and exclusion of evidence are within the broad discretion of the trial court. *State v. Mays* (1996), 108 Ohio App.3d 598, 617, 671 N.E.2d 553. Abuse of discretion is more than a mere error of judgment; it is conduct that is arbitrary, capricious, unreasonable, or unconscionable. *State v. Moreland* (1990), 50 Ohio St.3d 58, 61, 552 N.E.2d 894.

{¶ 22} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *State v. Madrigal* (2000), 87 Ohio St.3d 378, 721 N.E.2d 52, the Ohio Supreme Court was faced with the question whether Madrigal's right to confrontation was violated when the court admitted an accomplice's taped statement that implicated Madrigal in a robbery and murder and implicated the accomplice as going with Madrigal but waiting in the car. In discussing the standard to apply, the court stated:

{¶ 23} "The state may deny the accused the right to cross-examination without violating the Confrontation Clause if the court deems the proffered out-of-court statements to be 'so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.' *White v. Illinois* (1992), 502 U.S. 346, 357, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 860. That is, the right to confrontation is not absolute and 'does not necessarily prohibit the admission of hearsay statements against a criminal defendant.' *Idaho v. Wright* (1990), 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 651. Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) '[fall] within a firmly rooted hearsay exception,' or (2) contain ' "adequate indicia of reliability." ' *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608." *Madrigal,* 87 Ohio St.3d at 385, 721 N.E.2d 52.

{¶ 24} The court explained, however, that the *Roberts* decision no longer allowed a court to find that an accomplice's statement against penal interest, in the declarant's absence, offered by the prosecution, categorically satisfied the Confrontation Clause. Id. at 386–387, 721 N.E.2d 52, citing *Lilly,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117. Therefore, in order to admit an accomplice's statement against interest, offered by the prosecution, the court must first find

that the statement contains adequate indicia of reliability. Id. at 386, 721 N.E.2d 52. But courts have consistently considered these statements as "presumptively unreliable." See id. at 386–387, 721 N.E.2d 52; *Lilly*, 527 U.S. at 130, 119 S.Ct. 1887, 144 L.Ed.2d 117; *Lee*, 476 U.S. at 541, 106 S.Ct. 2056, 90 L.Ed.2d 514. The *Madrigal* court commented on this presumption of unreliability:

{¶ 25} "While the Supreme Court has clearly stated that 'the presumption of unreliability that attaches to codefendants' confessions * * * may be rebutted,' *Lee*, 476 U.S. at 543, 106 S.Ct. at 2063, 90 L.Ed.2d at 527, the more recent *Lilly* plurality cautions us that '[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.' *Lilly*, 527 U.S. at 137, 119 S.Ct. at 1900, 144 L.Ed.2d at 135." *Madrigal*, 87 Ohio St.3d at 387, 721 N.E.2d 52.

{¶ 26} After reviewing the law on accomplice statements, the *Madrigal* court analyzed the state's arguments in support of the trustworthiness of the accomplice's statement. The court determined that the state's only support for the statement's trustworthiness was that other evidence corroborated the accomplice's statement. The court noted, however, that the *Lilly* plurality held that corroborating evidence is irrelevant. Id., citing *Lilly*, 527 U.S. at 137, 119 S.Ct. 1887, 144 L.Ed.2d 117. The court concluded that the relevant circumstances included " '*only those that surround* the making of the statement and that render the declarant particularly worthy of belief.' (Emphasis added.)" Id., quoting *Wright*, 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638. Relying on *Wright*, the court stated that the circumstantial guarantees of trustworthiness are those that existed when the statement was made and do not include those that may be added by using hindsight. Id.

{¶ 27} The *Madrigal* court also noted that the statement indicated a desire by the accomplice to minimize his involvement by attempting "to portray himself as an innocent bystander" and place the sole blame on Madrigal. Id., 87 Ohio St.3d at 384, 388, 721 N.E.2d 52. Additionally, the court noted that Madrigal's defense tried to place the blame for the crimes on the accomplice, which made the need for cross-examination more crucial. The court concluded that the admission of the accomplice's statement violated Madrigal's Confrontation Clause rights. But it found the error was harmless due to other eyewitness testimony.

{¶ 28} We must now apply the law set out by the Ohio Supreme Court in *Madrigal* in analyzing Calwise's confession. As instructed by *Madrigal*, the trial court explained that it was not permitted to use corroborating evidence to find

that Calwise's confession was reliable and would not do so. The court demonstrated that it applied the law correctly, noting that had Calwise stated in his confession that he merely accompanied appellant but did not participate in the crimes, the confession would not be admissible. But the court went on to observe that in this case, Calwise's confession implicated both appellant and Calwise, thus demonstrating its reliability.

{¶ 29} The court stated several other factors it found to indicate reliability. First, the court stated that one of its reasons for allowing the tape was Calwise's reenactment of the crime at the scene. The court noted that Calwise's detail of what was where, who was where, and how things occurred demonstrated reliability. It said that the reenactment "clearly shows someone who was there and someone who knew what happened there and helps to render that statement admissible." Second, the court pointed to the fact that the state did not offer Calwise a deal for his confession. Third, it took note of the fact that it was Calwise himself who contacted Detective Morales to give his confession. Here the court continued to follow *Madrigal's* dictates, along with those of *Lilly* and *Wright,* because it considered the circumstances surrounding the making of the statement that rendered Calwise particularly worthy of belief.

{¶ 30} The trial court also took guidance from *State v. Marshall* (2000), 136 Ohio App.3d 742, 737 N.E.2d 1005, in making its decision. In *Marshall,* the Eighth District held that a "voluntary confession, not made pursuant to a deal with the prosecution, and which implicates both the accomplice and the defendant has sufficient indicia of reliability." Id. at 748, 737 N.E.2d 1005. The *Marshall* court reversed the trial court's decision to exclude an accomplice's confession in a robbery and murder. In finding that the confession contained particularized guarantees of trustworthiness, the court relied on several factors. It pointed to the fact the accomplice's entire narrative was self-inculpatory, in that he admitted to assisting in the robbery and acting as the lookout. The court noted that the accomplice was not under the influence when he made the statement and was not responding to leading questions. Finally, although the police initially said they might be able to cut him some slack if he confessed, they did not offer the accomplice a deal in exchange for his confession. Thus, the court concluded the introduction of the accomplice's statement did not violate the defendant's Confrontation Clause rights.

{¶ 31} All of the same factors the court relied on in *Marshall* in finding particularized guarantees of trustworthiness are present in this case. Several of the factors were discussed above. Additionally, there is no indication that Calwise was under the influence of drugs or alcohol. And Calwise's entire narrative was self-inculpatory. Furthermore, Detective Morales asked only a few

leading questions after Calwise volunteered the information first. Most of his statement was in narrative form.

{¶ 32} The court also took an additional safeguard in allowing appellee to play Calwise's confession for the jury. The court gave the jury an instruction on Calwise's credibility before allowing appellee to play the tape. It instructed:

{¶ 33} "The testimony of an accomplice does not become inadmissible because of his complicity in the crimes, his moral turpitude or his self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require that it be weighed with great caution. It is for you as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶ 34} Thus, the court made an effort to inform the jury that it should view Calwise's statement with great caution.

{¶ 35} Appellant contends that Calwise's confession was inherently unreliable given the surrounding circumstances. During the investigation, the police recovered some clothes from Calwise's house, which they sent for DNA testing. The DNA results came back on or about March 29, 1999. The results revealed that some of DeShun's blood was on Calwise's clothes. Appellant alleges that Calwise learned of the DNA results, and because he knew DeShun's blood was found on his clothes, he sought to talk with Detective Morales in order to explain why DeShun's blood was found on his clothes and otherwise minimize his involvement. Detective Morales testified that he informed Calwise's father that blood test results had come back positive. Shortly thereafter, Calwise gave his confession. Additionally, Calwise's attorney testified that he informed Calwise of the DNA evidence linking him to the crime scene.

{¶ 36} Appellant alleges that Calwise gave his confession in an effort to minimize his own involvement and place the blame on appellant. He tries to demonstrate this theory with the above timeline of events. Yet the timeline does not support appellant's theory. Calwise had been in jail for several months when he began contacting Detective Morales. Detective Morales testified that appellant began contacting him, wanting to talk, sometime in February 1999. Appellant tried several more times to talk with Detective Morales before the DNA results were known. Each time appellant contacted him, Detective Morales told him he needed to speak with his attorney. After appellant persisted, Detective Morales contacted the prosecuting attorney's office seeking advice on whether to talk to Calwise. Upon advice from the office, Detective Morales met with Calwise on April 20, 1999, and Calwise gave his confession. Thus, if appellant's theory had merit, Calwise would not have started contacting Detective Morales until after the DNA results linking him to the crime scene were known.

Furthermore, even though Calwise implicated appellant as the principal shooter, he hardly minimized his own involvement. He admitted to shooting a four-year-old boy in the neck, standing watch while appellant shot three people, and planning and carrying out an armed robbery. Accordingly, the circumstances surrounding Calwise's confession were not inherently unreliable, as appellant suggests.

{¶ 37} Next, appellant argues that the court erred in applying state law instead of federal law. The court properly applied both state and federal law. It relied on *Madrigal,* a recent Ohio Supreme Court case, which in turn relied on a number of United States Supreme Court cases in reaching its decision including, *Lilly,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117; *White,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848; *Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638; and *Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597.

{¶ 38} Finally, in his reply brief, appellant argues that the police violated Calwise's Sixth and Fourteenth Amendment rights to counsel when they took his statement. But appellant does not have standing to raise this issue. Generally, one can assert violations only of his own constitutional rights and not those of third parties. *State v. Bencic* (May 3, 1995), 9th Dist. No. 16895, 1995 WL 256188, citing *Warth v. Seldin* (1975), 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. This rule applies in the context of constitutional criminal procedure. *Bencic,* 9th Dist. No. 16895, citing *Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387. Thus, appellant cannot argue that Calwise's constitutional rights were violated.

{¶ 39} Accordingly, the trial court did not abuse its discretion in admitting Calwise's confession, and appellant's first assignment of error is without merit.

{¶ 40} Appellant's second assignment of error states:

{¶ 41} "It was an abuse of discretion and error to admit the testimony of Brea Aziz."

{¶ 42} Brea was an eyewitness to the crimes. She was able to identify appellant as the one who shot her, Lashawnda, and DeShun. At the time of the shootings, Brea was three and a half years old. Appellee planned to call her as a witness at trial. Appellant filed a motion challenging Brea's competence based on her young age. The court held a hearing and questioned Brea. At that time, Brea was four years old. It determined she was competent to testify.

{¶ 43} Appellant again raised the issue of Brea's competence at trial. The court briefly requestioned Brea, then age six, and again determined her to be a competent witness.

{¶ 44} Appellant argues that Brea was incompetent as a witness. Appellant contends that the court's examinations of Brea did not deal with her ability to receive accurate impressions of fact about which she would have to testify or with her ability to recollect those impressions of fact and her ability to communicate what she observed. He also asserts that Brea's examination established that she was generally incapable of accurate impressions and lacked the ability to recollect and relate what she experienced.

{¶ 45} "Every person is competent to be a witness except * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Evid.R. 601(A). When presented with a child witness under ten, the trial court must conduct a voir dire examination of the child to determine whether the child is competent to testify. *State v. Frazier* (1991), 61 Ohio St.3d 247, 251, 574 N.E.2d 483. The competence determination is within the trial court's sound discretion and will not be reversed absent an abuse of that discretion. Id.

{¶ 46} When evaluating a child's competence, the trial court must consider "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus.

{¶ 47} In the present case, the trial court conducted a lengthy interview with Brea. The court, appellant's counsel, and appellee all questioned Brea. At the time, Brea was four years old. The court asked Brea what she liked to watch on television, and she stated that she liked "Rugrats." The court asked her who was in the Rugrats, and Brea correctly stated, "Angelica and Tommy and Chuckie." The court asked Brea if she believed in Santa Claus, to which she responded, "Yes." The court asked her if she remembered anything she got for Christmas last year. Brea told the court she got "A Bug's Life" and some coffee cups, which she still plays with. The court next asked Brea what she did for her birthday. Brea told the court that she got a bus. When the court asked if she had a party, Brea said, "Yeah," and said that her friend Darian came over.

{¶ 48} Brea's responses to the above questions demonstrated her ability to accurately receive impressions of fact, to recollect those impressions, and to relate her impressions to the court. She demonstrated that she remembered things that took place at Christmastime (approximately eight months before the hearing), at her birthday party, and on television. All of these recollections

showed that Brea was able to observe something, remember it, and convey her memory to the court.

{¶ 49} Brea also demonstrated that she knew the difference between truth and falsity and understood that she should tell the truth. The court asked Brea what her mommy told her about telling the truth. She responded that if she tells the truth, she will not get a whopping. Brea stated that she tells the truth. When the court asked Brea if she ever told a fib, she said no because if she did, she would get a whopping. Later, the judge again inquired about Brea's ability to differentiate between truth and falsity and her obligation to tell the truth. The following colloquy took place:

{¶ 50} "Q. Do you know when you come to a courtroom that you have to tell the truth?

{¶ 51} "A. Yes.

{¶ 52} "Q. What is the truth, can you tell me what it is?

{¶ 53} "A. Good word.

{¶ 54} "Q. All right. Do you know what happens if you don't tell the truth when you come to court?

{¶ 55} "A. You will get a whopping.

{¶ 56} "Q. Did you ever get a whopping?

{¶ 57} "A. Yeah.

{¶ 58} "Q. Do you like that?

{¶ 59} "A. No, I don't like whoppings."

{¶ 60} Appellee also questioned Brea to determine whether she knew what a lie was. Appellee asked Brea what color her slip was. Brea said it was white. Appellee asked her if he said her slip was blue, would he be telling the truth or a lie. Brea stated it would be a lie.

{¶ 61} Brea's responses to these questions demonstrated her understanding of truth and falsity and her appreciation of her responsibility to be truthful. The court took time to make certain that Brea knew she had to tell the truth and that she knew what truth was. Additionally, appellee's questions further demonstrated that Brea understood the difference between the truth and a lie.

{¶ 62} Appellant points to some of Brea's incorrect responses in arguing that she was incompetent. Specifically, he claims that since she incorrectly stated when her birthday was and did not know how old her brother was, this demonstrated her incompetence. Other courts have held child witnesses competent to testify even though they answered some questions wrong. For example,

in *State v. Goins* (Dec. 3, 2001), 12th Dist. No. CA2000–09–190, 2001 WL 1525298, the seven-year-old witness did not know her grandmother's last name, what day of the week or what month it was, thought summer came before spring, stated that her birthday, which was November 15, was in the summertime, and could not remember what she had received for Easter that year. Nonetheless, the court found her competent to testify, noting that she answered other questions correctly. And in *State v. Brooks* (Oct. 26, 2001), 2d Dist. No. 18502, 2001 WL 1295285, the court found the four-year-old witness competent even though she was unable to state the sequence of months and the time frames of the holidays, and was unable to recall the name of her school or her teacher. The court stated that the fact that the child could not remember certain generalities did not render her incompetent to testify. As was the case in *Goins* and *Brooks,* the court in this case conducted a thorough examination of Brea, which revealed that she met all five elements of the *Frazier* test. Although Brea answered some questions incorrectly, she answered many questions correctly, such as her brother's, sister's, and mother's names, the characters on a television show, what color Barney is, and what she received for Christmas.

{¶ 63} Appellant also points to Brea's imaginative responses to support his incompetence argument. Particularly, he refers to her statement that she believes in Santa Claus, a point during the questioning when she placed her fingers over her eyes and pretended she was looking through binoculars, and her statement that she sees monsters like Freddie Kruger and the bogeyman. When counsel brought up concerns about Brea's "figments of imagination," the court responded:

{¶ 64} "She is three years old, four years old. I would be disappointed if she didn't have an imagination. You know, one of the things that I have to consider in all of this is how old this child is, how tender she is. And certainly she may very well be someone with an imagination, someone who acts and thinks like a child. The determination I have to make is whether or not she can tell accurately the story about what happened to her on the night in question or the day in question, whatever it is. And all those other things are part of her makeup, certainly, but they are not things that disqualify her. In my interpretation they may qualify her because she appears to be a normal child."

{¶ 65} The trial court was correct in its statement to counsel regarding Brea's imaginative responses. The Fifth District found a child witness competent to testify regardless of his imaginative beliefs that the "Pokemon" cartoon characters were real and that TV wrestling was real. *State v. Reardon,* 5th Dist. No. 2001AP080082, 2002-Ohio-2537, 2002 WL 1025488. Four-year-old children generally believe in such things as Santa Claus and the bogeyman and frequently play make-believe. Brea's responses did not indicate that she was unable to perceive or relate facts or that she did not understand her responsibility to be truthful.

{¶ 66} Finally, appellant contends that the court could not find Brea competent because it failed to question her about the shootings. The court in *Brooks*, 2d Dist. No. 18502, addressed this issue and concluded that while it would have been helpful if the trial court had questioned the child about the crime, it was not necessary in the court's competence determination. The court, quoting *State v. Mayhew* (1991), 71 Ohio App.3d 622, 629, 594 N.E.2d 1133, stated, " 'Once the court determines that a person can properly recount events from the past and knows that she should tell the truth in court, she is competent.' " Id. In the present case, the court determined Brea's competence by asking her questions that demonstrated that she could recount and relate past events and that she knew she should tell the truth in court. Therefore, we cannot say that the court abused its discretion in failing to question Brea about the shootings.

{¶ 67} Hence, the trial court did not abuse its discretion in finding Brea competent to testify. The trial judge who saw Brea and listened to her testify was in a far better position to judge her competence than this court, which only reads her testimony from the record. *State v. Clark* (1994), 71 Ohio St.3d 466, 470, 644 N.E.2d 331. Accordingly, appellant's second assignment of error is without merit.

{¶ 68} Appellant's third assignment of error states:

{¶ 69} "The court erred when it failed to suppress testimony concerning an out of court identification of Anderson by Brea Aziz."

{¶ 70} At trial, Detective Morales testified regarding a photo lineup that he showed Brea while she was in the hospital. The lineup consisted of six photographs, including one of appellant. Detective Morales asked Brea if she could pick out the man who shot her. Brea identified appellant. Detective Morales switched the pictures around several times and asked Brea the same question. Each time she picked out appellant.

{¶ 71} Appellant filed a motion to suppress Brea's identification of him. On September 15, 1999, the court held a hearing on the motion. After hearing testimony from Detective Morales, the court overruled the motion to suppress.

{¶ 72} Appellant argues that at the time of the photo lineup, Brea was not competent as a witness. He also argues that her identification constituted hearsay. Appellant contends that the admission of hearsay statements presupposes that the speaker had the qualifications of a witness, including competence. Appellant contends that due to Brea's incompetence, the trial court should have suppressed Detective Morales's testimony concerning Brea's out-of-court identification.

{¶ 73} When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings and relies upon

the trial court's ability to assess the witness's credibility, but independently determines, without deference to the trial court, whether the trial court applied the appropriate legal standard. *State v. Rice* (1998), 129 Ohio App.3d 91, 94, 717 N.E.2d 351. A trial court's decision on a motion to suppress will not be disturbed when it is supported by substantial credible evidence. Id.

{¶ 74} First, Brea's identification of appellant was not hearsay. A statement is not hearsay if it is a prior statement by a witness and "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification." Evid.R. 801(D)(1)(c).

{¶ 75} Brea testified at trial and was subject to cross-examination. Additionally, her statement was one of identification of a person soon after perceiving him (the shootings occurred on November 8, 1998, and Brea identified appellant on November 12, 1998). Finally, the circumstances surrounding the identification demonstrate its reliability. Brea was still hospitalized. Detective Morales and Detective Maietta went to Brea's hospital room to talk with her and brought the photo lineup. The lineup contained six pictures, all of men with characteristics similar to appellant's. Appellant has not alleged that the photo array was unduly suggestive in any way. Before showing her the photo array, Detective Morales asked Brea who shot her. Brea stated that "Ant" shot her. Appellant goes by the nickname "Ant" and even has it tattooed on his arm. When Detective Morales showed Brea the photo array, she identified appellant. Detective Morales switched the order of the photos several times, and each time Brea identified appellant. Since Brea's identification met the requirements of Evid.R. 801(D)(1)(c), it was not hearsay.

{¶ 76} Additionally, as discussed in appellant's second assignment of error, the court held a thorough hearing on the issue of Brea's competence. The hearing took place approximately nine months after she identified appellant. The basis for appellant's argument is that the court erred in finding Brea competent at that hearing. We have already determined that the court did not abuse its discretion in ruling Brea a competent witness. Accordingly, appellant's third assignment of error is without merit.

{¶ 77} For the reasons stated above, the trial court's judgment is hereby affirmed.

Judgment affirmed.

VUKOVICH and FORD, JJ., concur.

DONALD R. FORD, J., Eleventh District Court of Appeals, sitting by assignment.