[Cite as *State v. Pickens*, 2017-Ohio-1231.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

       PLAINTIFF-APPELLEE,                  CASE NO.  9-16-35

       v.

HAROLD PICKENS,                    O P I N I O N

       DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 16-CR-034

Judgment Affirmed

Date of Decision:  April 3, 2017

APPEARANCES:

    *Robert E. Cesner, Jr.* for Appellant

    *Kevin P. Collins* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Harold A. Pickens ("Pickens"), appeals the June 7, 2016 judgment entry of sentence of the Marion County Court of Common Pleas. He argues that the trial court erred by denying his motion to suppress evidence and by concluding that the victim, who was under the age of ten, was competent to testify. For the reasons that follow, we affirm.

{¶2} On January 28, 2016, the Marion County Grand Jury indicted Pickens on Count One of gross sexual imposition in violation of R.C. 2907.05(A)(4), a third-degree felony, and Count Two of rape in violation of R.C. 2907.02(A)(1)(b), a first-degree felony. (Doc. No. 2).

{¶3} On February 1, 2016, Pickens appeared for arraignment and entered pleas of not guilty. (Doc. No. 7). The State filed a bill of particulars on February 26, 2016. (Doc. No. 17).

{¶4} On March 24, 2016, Pickens filed a motion to suppress evidence. (Doc. No. 38). After a hearing on April 19-20, 2016, the trial court denied Pickens's motion to suppress evidence on May 3, 2016. (Doc. No. 50).

{¶5} On May 27, 2016, the parties stipulated that "the school records, including mental and achievement evaluations" are "to be considered in the competency hearing of the alleged child victim" "in lieu of calling as witnesses those school administrators, teachers, and other officials to testify at the time of said

hearing." (Doc. No. 53). On June 6, 2016, after a hearing on June 2, 2016, the trial court filed an entry concluding that the alleged child victim is competent to testify. (Doc. No. 68).

**{¶6}** On June 3, 2016, Pickens withdrew his pleas of not guilty and entered a no-contest plea to Count Two of an amended indictment. (Doc. No. 66).[1] In exchange for his change of plea, the State agreed to dismiss Count One of the original indictment and amend Count Two to remove the allegation that "the victim is under the age of 10 years old." (*Id.*). That same day, the trial court amended the indictment and dismissed Count One. (Doc. No. 69). Also that day, the trial court accepted Pickens's plea to the amended indictment, found him guilty, and sentenced him to "an indefinite prison term consisting of a minimum term of 10 years and a maximum term of life imprisonment," and concluded that he is a Tier III sex offender. (*Id.*). The trial court filed its judgment entries of sentence and sex-offender classification on June 7, 2016. (*Id.*).

**{¶7}** Pickens filed his notice of appeal on June 30, 2016. (Doc. No. 73). He raises two assignments of error for our review.

## Assignment of Error No. I

**The Trial [sic] Erred by Denying the Motion to Suppress Statements and Admissions Made by the Defendant at Police Headquarters on January 14 and 15, 2016. Specifically, Defendant Was Not Advised of His Miranda Rights While in a**

---

[1] The negotiated plea agreement was filed on June 6, 2016. (Doc. No. 66).

**Custodial Setting on January 14th. When the Interrogation Was Resumed on 15th [sic], the Defendant Was Given No Opportunity to Exercise or Waive His Miranda Rights Either Orally or in Writing. Under the Totality of the Circumstances, Defendant's Statements and Admissions Were Therefore Involuntary.**

{¶8} In his first assignment of error, Pickens argues that the trial court erred by denying his motion to suppress evidence. Specifically, Pickens argues that his statements to law enforcement on January 14, 2016 are inadmissible because those statements were provided during a custodial interview, and he was not advised of his *Miranda* rights. Further, Pickens argues that his statements to law enforcement on January 15, 2015 are inadmissible because he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights.

{¶9} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo; therefore, we must decide whether

-4-

the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶10} "The Fifth Amendment to the U.S. Constitution provides a privilege against self-incrimination." *State v. Edmond*, 10th Dist. Franklin No. 15AP-574, 2016-Ohio-1034, ¶ 11, citing *State v. Hall*, 179 Ohio App.3d 727, 2008-Ohio-6228, ¶ 12 (10th Dist.), citing *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136 (1984). "To protect this right, the United States Supreme Court has held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Id.*, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). "Thus, *Miranda* warnings are required when a suspect is subjected to custodial interrogation." *Id.*, citing *State v. Garnett*, 10th Dist. Franklin No. 09AP-1149, 2010-Ohio-5865, ¶ 30. "Custodial interrogation is defined in *Miranda* as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.*, quoting *Miranda* at 444.

{¶11} "Recently, the United States Supreme Court has provided further guidance on the meaning of custody for purposes of *Miranda*." *Id.* at ¶ 12. "'"[C]ustody" is a term of art that specifies circumstances that are thought generally

to present a serious danger of coercion.'" *Id.*, quoting *Howes v. Fields*, 565 U.S. 499, 508-509 132 S.Ct. 1181 (2012). """"In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave.""" *State v. Gartrell*, 3d Dist. Marion No. 9-14-02, 2014-Ohio-5203, ¶ 62, quoting *State v. Billenstein*, 3d Dist. Mercer No. 10-13-10, 2014-Ohio-255, ¶ 38, quoting *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27. "In considering a suspect's freedom of movement, a court must consider the totality of the circumstances, including the following relevant factors: (1) the location of the questioning, (2) its duration, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning." *Edmond* at ¶ 12, citing *Howes* at 509. "However, freedom of movement is not a solely determinative factor, and courts must consider 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Id.*, quoting *Howes* at 509.

{¶12} A suspect may knowingly and intelligently waive his *Miranda* rights and agree to make a statement. *State v. Wesson*, 137 Ohio St. 3d 309, 2013-Ohio-4575, ¶ 35, citing *Miranda* at 479. "If a defendant later challenges a confession as

involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *Id.*, citing *Miranda* at 475 and *Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515 (1986). "To determine whether a valid waiver occurred, we 'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *Id.*, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, and citing *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246 (1991).

{¶13} The trial court denied Pickens's motion to suppress evidence after concluding that Pickens was not in custody for purposes of the January 14, 2016 interview at the police station, and after concluding that Pickens on January 15, 2016 "knowingly, intelligently, and voluntarily waived his *Miranda* rights based on the totality of the circumstances." (Doc. No. 50).

{¶14} In particular, the trial court concluded that Pickens was not in custody on January 14, 2016 after weighing the totality of the circumstances.[2] Weighing in favor of the conclusion that Pickens was in custody, the trial court found that the "interview took place at a police station, that [Pickens] was taken there in the back

---

[2] Pickens participated in two interviews on January 14, 2016 at the Marion Police Department. Pickens does not separately challenge those interviews on appeal. As such, for purposes of this appeal, we assume he is challenging the admissibility of both interviews under his argument related to the admissibility of his "statements" made on January 14, 2016.

of a police cruiser, and that his initial contact with the officers was due to them coming to his house with a search warrant." (*Id.*). Weighing against the conclusion that Pickens was in custody, the trial court found that Pickens "made a voluntary decision to go with the officers to the police station and was motivated by an effort to exonerate himself from any accusations" as well as that "the officers clearly explained to [Pickens] that he was not required to go with them, that he was not being arrested, and that the interview was voluntary on his part." (*Id.*). Further, weighing against the conclusion that Pickens was in custody, the trial court found that "at no time were any physical restraints used and, following the interview, the officers did take [Pickens] back to his house." (*Id.*).

{¶15} With respect to the January 15, 2016 interview, the trial court concluded that Pickens "knowingly, intelligently, and voluntarily waived his *Miranda* rights based on the totality of the circumstances." (*Id.*). Weighing in favor of the conclusion that Pickens knowingly, intelligently, and voluntarily waived his *Miranda* rights, the trial court found that law enforcement (1) "read [Pickens] his *Miranda* rights," (2) "had [Pickens] sign a *Miranda* rights form," and (3) "explained the rights separately and took care to inquire regarding [Pickens's] educational level and ability to understand the rights." (*Id.*). Weighing against that conclusion, the trial court found that law enforcement "did not specifically ask [Pickens] if he wished to waive his rights or have him sign the waiver of rights portion of the form."

(*Id.*).   The trial court further weighed, "[w]hile [law enforcement] assertively challenged [Pickens's] statements, there is no evidence that his will was overborn." (*Id.*).   As such, the trial court concluded that Pickens's statements were not involuntary.

{¶16} Our review of the record, including the suppression-hearing transcript and the interview video, reveals that the trial court's factual findings regarding the January 14 and 15, 2016 interviews are supported by competent, credible evidence. *See State v. Luke*, 3d Dist. Allen No. 1-06-103, 2007-Ohio-5906, ¶ 12, citing *State v. Ransom*, 3d Dist. Van Wert No. 15-06-05, 2006-Ohio-6490, ¶ 17.

{¶17} At the suppression hearing, Lieutenant Chris Adkins ("Lieutenant Adkins") of the Marion Police Department testified that he interviewed Pickens on January 14 and 15, 2016 at the Marion Police Station.  (Apr. 20, 2016 Tr. at 9).  The video recording of Lieutenant Adkins's interviews with Pickens on January 14 and 15, 2016 were played for the trial court.  (*Id.* at 6, 8-9); (State's Exs. 1, 2).

{¶18} Lieutenant Adkins testified that he did not advise Pickens of his *Miranda* rights on January 14, 2016 because Pickens came to the police station "[v]oluntarily and [because law enforcement] had no plans to arrest him that day." (Apr. 20, 2016 Tr. at 13).  Lieutenant Adkins also informed Pickens that day that he did not plan to arrest him.  (*Id.*).

{¶19} Regarding the January 15, 2016 interview, Lieutenant Adkins testified that Pickens executed a "Rights Waiver Form." (*Id*. at 10-11); (State's Ex. 4). Lieutenant Adkins read Pickens the "Waiver Rights" on the form one-by-one to ensure that he understood his rights. (Apr. 20, 2016 Tr. at 11). Lieutenant Adkins testified that he was satisfied that Pickens understood his rights based on Pickens's ninth-grade education, that Pickens can read and write the English language, and that Lieutenant Adkins read the waiver form to Pickens line-by-line and asked after each line whether Pickens understood his rights. (*Id.* at 18). He further testified,

> He waived 'em [sic] at the top [of the form]. He signed he acknowledged his rights. He never said he wanted an attorney. He said he would talk to me. He never refused to answer any questions I asked him. So, to me, he waived his Miranda Rights at the time.

(*Id.* at 25).

{¶20} Moreover, Lieutenant Adkins testified that his interview of Pickens on January 15, 2016 was not a continuation of his January 14, 2016 interview of Pickens because the January 14, 2016 interview was not

> an interrogation. It was a pure gathering of information for the sole fact that [the victim] needed to be interviewed again. So, the 14th we had absolutely no plans to arrest him. We made it perfectly clear with him on the 15th, at that point in time, I felt that thee [sic] interview

would turn into what we called an interrogation to try to get more information out of him and that's why - - and the possibility of him not walking out there, that's why I read him his Miranda Rights.

(*Id.* at 19). According to Lieutenant Adkins, "If [Pickens] would have said, 'I wanna [sic] leave' [during the January 14, 2016 interview], we would of walked him out and let him leave." (*Id.* at 20). Lieutenant Adkins did not have any concerns as to whether Pickens was coherent during either interview on January 14 or 15, 2016. (*Id.* at 12).

{¶21} Patrolman Michael Woods ("Patrolman Woods") of the Marion Police Department testified that he was present when a search warrant was executed at Pickens's residence on January 14, 2016. (Apr. 19, 2016 Tr. at 78). Patrolman Woods testified that he remained in the garage with Pickens, Patrolman Sam Walter ("Patrolman Walter"), and two case workers from Marion County Children's Services—Mandy Davis ("Davis") and Ellen Thrush ("Thrush"),—while detectives from the Marion Police Department searched Pickens's house. (*Id.* at 79). Patrolman Woods testified that he spoke with Pickens in the garage with the garage door open. (*Id.* at 79-80). He testified that Patrolman Walter, Davis, and Thrush were present while he spoke with Pickens, and that Pickens's son was present for a portion of that conversation. (*Id.* at 80). According to Patrolman Woods, the conversation lasted 20 to 25 minutes, and Pickens was willing to answer his

questions. (*Id.* at 80-81). Pickens was not handcuffed during the conversation. (*Id.* at 81-82).

{¶22} Later in the conversation, Patrolman Woods asked Pickens "if he'd come down willingly to do a - - a voluntary interview at the Police Department," to which Pickens agreed. (*Id.* at 82-83). As a result, Patrolman Woods transported Pickens to the police station with Pickens seated in the backseat of Patrolman Woods's cruiser. (*Id.* at 83). Pickens rode in the backseat of the cruiser because Patrolmen Woods and Walter rode in the front seats of the cruiser. (*Id.* at 84). According to Patrolman Woods, Patrolman Walter conducted a "precautionary" pat-down search of Pickens for weapons prior to allowing him in the cruiser. (*Id.* at 83-84).

{¶23} Prior to arriving at the police station, Patrolman Woods stopped at Pickens's son's house for "[n]ot long. Five, maybe ten minutes at the most" to look for an item that was described in the search warrant. (*Id.* at 83-84, 111). From Pickens's son's house, Patrolman Woods drove to the police station, where Pickens was directed to the "Interview Room." (*Id.* at 85). The interview of Pickens with Patrolman Woods, Davis, and Thrush on January 14, 2016 at the police station was recorded, and that recording was played for the trial court at the suppression hearing. (*Id.* at 85, 89, 98, 101, 103, 106); (State's Ex. 1).

{¶24} Patrolman Woods informed Pickens that "being there was voluntary [and that h]e was free to leave at any time." (Apr. 19, 2016 Tr. at 85). According to Patrolman Woods, he "didn't coerce [Pickens] or there wasn't any threats or anything like that made towards him or promises for him" coming to the police station for the interview. (*Id.*). That interview lasted approximately 40 minutes. (*Id.* at 86).

{¶25} According to Patrolman Woods, Pickens did not ask to leave the interview or make any movement indicating that he wanted to leave the interview. (*Id.* at 87). Pickens did not refuse to answer any questions. (*Id.*). Neither Patrolman Woods nor Davis or Thrush raised their voices. (*Id.*). The door to the interview room was closed but not locked. (*Id.* at 87-88). After the 40-minute interview, Lieutenant Adkins spoke with Pickens in the same interview room at the police station, and then Patrolman Woods returned Pickens to his residence. (*Id.* at 86-87, 90).

{¶26} After speaking with Pickens, Lieutenant Adkins, Davis, and Thrush again interviewed the victim, which revealed additional questions that they wanted to ask of Pickens. (*Id.* at 90-91). As such, Patrolman Woods testified that he and Patrolman Walter went to Pickens's residence on January 15, 2016, saw Pickens in the driveway, and asked Pickens if he would be willing to again go to the police station, to which Pickens agreed. (*Id.* at 91-92).

**{¶27}** Next, Patrolman Walter testified that he was present for "most" of the conversation with Pickens at Pickens's residence on January 14, 2016. (*Id.* at 117). He testified that he conducted a pat-down search of the outside of Pickens's clothing for weapons prior to transporting Pickens to the police station that day. (*Id.* at 118). Patrolman Walter recalled that Pickens was "willing to come down to the Station for an interview." (*Id.* at 121).

**{¶28}** He testified that he accompanied Patrolman Woods to Pickens's residence on January 15, 2016. (*Id.* at 119). According to Patrolman Walter, Pickens was again willing to go with them to the police station for another interview. (*Id.* at 122).

**{¶29}** Davis testified that she accompanied law enforcement to Pickens's residence for the January 14, 2016 search-warrant execution "to speak with [Pickens] regarding the allegations." (*Id.* at 16-17). According to Davis, Pickens was willing to speak with them but denied the allegations. (*Id.* at 22). According to Davis, Pickens was willing to go to the police station because "he had nothing to hide and he wanted to clear his name." (*Id.* at 32). Davis testified that law enforcement told Pickens on January 14, 2016 while at his residence that he did not have to go to the police station for the interview and that he was not under arrest. (*Id.* at 52, 54). Davis testified that, during the January 14, 2016 interview at the police station, Pickens was informed that he was not under arrest; Pickens was not

threatened; no one raised their voice; and the interview lasted 25 minutes. (*Id.* at 34). She testified that she asked him the majority of the questions, while Thrush and Officer Woods asked a few questions. (*Id.*). Davis characterized the interview as "conversational." (*Id.* at 35). She testified that the door to the interview room was closed but not locked. (*Id.*).

{¶30} Thrush testified that she accompanied Davis to Pickens's residence to speak with Pickens while law enforcement executed the search warrant. (*Id.* at 57). She testified that Pickens "was very willing to speak with us. He just kept telling us * * * he had nothing to hide. We were more than welcome to come to his home. That he didn't know why we had a search warrant cause [sic] we just could of came. He has nothing to hide. * * * He was very cooperative with us." (*Id.* at 58-59).

{¶31} Thrush testified, regarding the January 14, 2016 interview at the police station, that Pickens was "very willing to go. Said he had no issue. * * * He was absolutely willing to go. Said he would talk to us however long we wanted to * * * and that he would, you know, tell us whatever we needed to do [sic] to get his name cleared." (*Id.* at 59-60). Thrush recalled that Patrolmen Woods and Walter "made it very clear to [Pickens] that * * * he didn't have to come [to the police station]. It was absolutely on his willingness to come." (*Id.* at 60). She testified that, during the January 14, 2016 interview at the police station, Pickens did not indicate at any time that he wanted to end the interview or leave the interview room. (*Id.* at 63-65).

According to Thrush, no one raised their voice during the interview or expressed "displeasure" with Pickens's responses. (*Id.* at 65).

**{¶32}** We will first address whether Pickens was in custody on January 14, 2016; then, we will address whether Pickens knowingly, intelligently, and voluntarily waived his *Miranda* rights on January 15, 2016.

**{¶33}** Pickens was interviewed twice on January 14, 2016—at his home and at the police station. Because Pickens does not challenge on appeal the interview conducted at his residence, we will not address it. Weighing the totality of the trial court's factual findings regarding whether Pickens was in custody on January 14, 2016, we conclude that a reasonable person in Pickens's position would believe that he was free to leave. *See Luke*, 2007-Ohio-5906, ¶ 13, citing *State v. Greeno*, 3d Dist. Seneca No. 13-02-46, 2003-Ohio-3687, ¶ 15.

**{¶34}** This court previously stated, "to determine if an interrogation is custodial, "'"[t]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"'" *Id.* at ¶ 16, quoting *Ransom*, 2006-Ohio-6490, at ¶ 20, quoting *State v. Mason*, 82 Ohio St.3d 144, 153 (1998), quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983), and citing *Thompson v. Keohane*, 515 U.S. 99, 112, 116 S.Ct. 457 (1995). As in *Luke*, the facts of this case do not meet that standard because

Pickens was not formally arrested prior to, during, or after the interview, and he was never restrained to a degree equivalent to a formal arrest. *Id.* at ¶ 17.

**{¶35}** Indeed, although the interview took place at a police station, Pickens's freedom was not restricted. *See State v. Fahl*, 2d Dist. Clark No. 2005-CA-98, 2006-Ohio-1809, ¶ 3 ("*Miranda* warnings are not required simply because the questioning takes place in the police station and the questioned person is a suspect."), citing *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711 (1977) and *State v. Petitjean*, 140 Ohio App.3d 517, 523-524 (2d Dist.2000). "We are mindful that the United States Supreme Court has stated that questioning of a suspect at a police station does not inherently require a conclusion that the defendant was in custody:

> [A] noncustodial situation is not converted to one in which *Miranda*
> applies simply because a reviewing court concludes that, even in the
> absence of any formal arrest or restraint on freedom of movement, the
> questioning took place in a "coercive environment." Any interview
> of one suspected of a crime by a police officer will have coercive
> aspects to it, simply by virtue of the fact that the police officer is part
> of a law enforcement system which may ultimately cause the suspect
> to be charged with a crime. But police officers are not required to
> administer *Miranda* warnings to everyone whom they question. Nor
> is the requirement of warnings to be imposed simply because the

questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*State v. Brantley*, 9th Dist. Wayne No. 27466, 2016-Ohio-4680, ¶ 63, quoting *Mathiason* 495.

{¶36} Furthermore, the circumstances of this case indicate that Pickens's freedom was not restricted. Pickens voluntarily accompanied the law-enforcement officers to the police station. *See Luke* at ¶ 14 (concluding that Luke's "freedom was not restricted," in part, because "Luke voluntarily accompanied the detectives to the station"); *State v. Scott*, 3d Dist. Seneca Nos. 13-04-35 and 13-04-36, 2005-Ohio-549, ¶ 8 (concluding that Scott was not in custody for purposes of *Miranda* because she voluntarily appeared at the police station and "was free to leave at any time while she was questioned"), citing *Mathiason* at 495. Pickens was never physically restrained in any manner before, during, or after the interview. *See Luke* at ¶ 14 ("Luke was never physically restrained in any manner before, during, or after the interview."); *Fahl* at ¶ 3 (finding that, because Fahl "was not in handcuffs when he was transported to the police department," weighed against concluding that he

was in custody). Pickens was informed that he was not under arrest, was informed that he would be taken home after the interview, and was taken home at the conclusion of the interview. *See Luke* at ¶ 14 ("Luke was informed that he would be taken home after the interview and, in fact, left with his girlfriend following the interview."); *Fahl* at ¶ 3 (concluding, in part, "that Fahl was not in custody at the time he was interviewed at the police department" because "he was expressly told he was not under arrest"). Indeed, Lieutenant Adkins told Pickens that he would be leaving the police station that day irrespective of what Pickens said. *See Brantley* at ¶ 61 ("Later in the interview, Detective Morrison repeatedly told Mr. Brantley that he would be leaving the police station that day irrespective of what he said."), citing *United States v. Malcom*, 435 F.App'x 417, 421 (6th Cir.2011) (noting that because the defendant was told that he could leave and was not under arrest weighs against being in custody). Pickens did not ask to leave. *See id.* at ¶ 61 (concluding that Brantley "never requested to leave" weighed against concluding he was in custody). The door to the interview room was not locked. *State v. Isaac*, 2d Dist. Greene No. 2003-CA-91, 2004-Ohio-4683, ¶ 19 (concluding that because the door to the interview room at the police station was not locked weighed against the conclusion that Isaac was in custody). Finally, the January 14, 2016 interviews lasted a combined total of approximately 60 minutes. *See State v. Malone*, 5th Dist. Licking No. 14CA89, 2015-Ohio-3436, ¶ 25 (concluding that the fact that the

interview lasted 90 minutes weighed against the conclusion that Malone was in custody); *Isaac* at ¶ 23 (concluding that the fact that the interview lasted two hours weighed against the conclusion that Isaac was in custody).

{¶37} Moreover, while the interview video depicts Lieutenant Adkins challenging Pickens regarding some inconsistencies regarding his account and the victim's account, the interview video demonstrates that: Pickens was, for the most part, calm and responsive to questions; the law enforcement officers and case workers were not coercive, threatening, or dominating; and the law enforcement officers and case workers did not trick or overpower Pickens into making involuntary statements. *See Luke* at ¶ 14.

{¶38} Accordingly, we conclude that the January 14, 2016 interview was non-custodial. *See id*. at ¶ 14; *Fahl* at ¶ 3. As such, *Miranda* warnings were not required. Therefore, the trial court did not err by admitting Pickens's January 14, 2016 interview statements into evidence. *Luke* at ¶ 14.

{¶39} Next, assuming without deciding that the January 15, 2016 interview was a custodial interview, the State proved by a preponderance of the evidence that Pickens validly waived his *Miranda* rights and voluntarily spoke with Lieutenant Adkins. Weighing the totality of the trial court's factual findings regarding whether Pickens knowingly, intelligently, and voluntarily waived his *Miranda* rights on

January 15, 2016, we conclude that Pickens's waiver was knowing, intelligent, and voluntary, and that his statements were voluntary.

{¶40} "The inquiry whether a waiver is coerced has two distinct dimensions." *State v. Dailey*, 53 Ohio St.3d 88, 91 (1990). "The state must prove not only that the suspect voluntarily waived his rights but also that the suspect acted knowingly and intelligently in doing so." *State v. Barker*, ___ Ohio St.3d ___, 2016-Ohio-2708, ¶ 27, citing *Dailey* at 91-92 (separately analyzing whether waiver was knowing and intelligent despite holding that a waiver is voluntary "absent evidence that [the suspect's] will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct").

{¶41} First, Pickens's waiver was voluntary. "Coercive police activity during the course of an interrogation is a necessary predicate for finding that a suspect's *Miranda* waiver was involuntary." *State v. Kirk*, 3d Dist. Crawford No. 3-12-09, 2013-Ohio-1941, ¶ 28, citing *Connelly*, 479 U.S. at 170 ("The voluntariness of a waiver * * * has always depended on the absence of police overreaching.") and *State v. Getsy*, 84 Ohio St.3d 180, 189 (1998) ("Evidence of use of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) triggers the totality-of-the-circumstances analysis."). The Supreme Court of Ohio has "held that a waiver is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or

deprivation of food, medical treatment, or sleep." (Emphasis sic.) *Id.*, citing *State v. Cooey*, 46 Ohio St.3d 20, 28 (1989).

**{¶42}** The trial court's conclusion that Lieutenant Adkins did not use coercive tactics is supported by competent, credible evidence—namely, Lieutenant Adkins's testimony and the video recording of Pickens's interview. Indeed, there is no evidence that Pickens was subjected to intimidation, deception, or coercion— that is, there is no evidence that Lieutenant Adkins threatened Pickens, withheld food, sleep, or medical treatment, or made him fearful. *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 175, citing *Berghuis v. Thompkins*, 560 U.S. 370, 386-387, 130 S.Ct. 2250 (2010) (concluding that there was "no evidence of coercion when police officers did not threaten the suspect, withhold food or sleep, or make him fearful"). *See also Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, at ¶ 41 ("This record does not support his allegation of police coercion, as neither the audio recording of the statement nor the testimony from the suppression hearing indicates any physical abuse, threats, or efforts to deprive Wesson of food, medical treatment, or sleep."). As such, the totality of the circumstances of this case indicate that Pickens's waiver was voluntary.

**{¶43}** Pickens's waiver was also knowing and intelligent. "When assessing the knowing and intelligent nature of a *Miranda* waiver, a suspect's signed waiver form is 'strong proof' of its validity." *Kirk* at ¶ 29, citing *State v. Moore*, 81 Ohio

St.3d 22, 32 (1998), citing *North Carolina v. Butler*, 441 U.S. 369, 374-375, 98 S.Ct. 1755 (1979). In this case, Lieutenant Adkins read each *Miranda* right to Pickens and stopped after each line to ask Pickens if he understood that right. After hearing his *Miranda* rights and indicating that he understood them, Pickens signed the form indicating that he understood his *Miranda* rights. (*See* State's Ex. 4). Lieutenant Adkins took additional steps to ensure that Pickens was capable of understanding the rights he was waiving by asking Pickens about his education, ability to read and write, and ability to understand right from wrong. *Compare Kirk* at ¶ 31-33, citing *Garner v. Mitchell*, 557 F.3d 257, 261-262 (6th Cir.2009). These facts indicate that Pickens's waiver was knowing and intelligent.

{¶44} Nonetheless, Pickens argues on appeal that his *Miranda* waiver is invalid because he indicated to Lieutenant Adkins that he understood his rights, not that he waived them. That is, Pickens argues that he merely signed the form indicating that he understood his rights but did not sign the bottom of that form, which is titled "Waiver of Rights." He further argues that his waiver is invalid because he responded "somewhat" when asked if he understood his rights. It is well settled that a *Miranda* waiver need not be expressly made to be valid; rather, a waiver may be inferred from the suspect's behavior, viewed in light of all of the surrounding circumstances. *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 11. Based on our discussion above, we reject Pickens's argument that he did not

validly waive his *Miranda* rights because he did not sign the bottom of the form titled "Waiver of Rights." *See United States v. Jackman*, 214 F. App'x 814, 816 (10th Cir.2007) ("Although [Jackman] * * * was not asked to sign a waiver form, [he] acknowledged each of his *Miranda* rights and, when asked if he had 'any questions about it at all,' he responded 'No sir.'"). We also reject Pickens's argument that his waiver is invalid based on his response that he "somewhat" understood his rights. Pickens's argument is belied by the facts that (1) he signed the form indicating that he understood his rights, (2) he acknowledged that he understood each right after Lieutenant Adkins read each *Miranda* right to him, and (3) he agreed to answer questions. *See Kirk* at ¶ 36, citing *Smith v. Mullin*, 379 F.3d 919, 932-934 (10th Cir.2004) and *United States v. Turner*, 157 F.3d 552, 555 (8th Cir.1998).

**{¶45}** Pickens also argues that his *Miranda* waiver was not valid because of his "lack of education and familiarity with the criminal process." (Appellant's Brief at 9). "'[A]n individual's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights.'" *Kirk* at ¶ 29, quoting *State v. Lynn*, 7th Dist. Belmont No. 11 BE 18, 2011-Ohio-6404, ¶ 14. "Rather, the suspect's intelligence must be considered in light of the interrogation's other circumstances, including the suspect's own conduct and representations during the interrogation." *Id.* at ¶ 30, citing *Garner* at 264 ("It is well-established * * * that mental capacity is one of

many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights.") and *State v. Jenkins*, 15 Ohio St.3d 164, 233 (1984) (stating that the suspect's intelligence is merely "one factor" in the assessment of a *Miranda* waiver's validity). *See also Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, at ¶ 41 ("Wesson's claim of a limited education may evidence 'low mental aptitude,' but that alone does not demonstrate involuntariness.").

{¶46} Notwithstanding Pickens's ninth-grade education, there is no evidence in the record to suggest that Pickens had any mental deficiencies, which would render his waiver invalid. *See Kirk* at ¶ 34 (concluding that Kirk did not display any "outward signs that he was of diminished mental capacity" during his interrogation); *State v. Schiessler*, 2d Dist. Montgomery No. 24771, 2012-Ohio-4085, ¶ 19, 21 (concluding that Schiessler's *Miranda* waiver was valid despite his ninth-grade education because there was "no evidence in the record to suggest that Schiessler had mental deficiencies"). Rather, the interview video demonstrates that Pickens was able to answer questions in a competent manner and had little difficulty understanding what was asked of him. *See State v. Bumgardner*, 11th Dist. Trumbull No. 2007-T-0106, 2008-Ohio-1778, ¶ 53 ("Our review of the record, including the videotape of the interview, demonstrates that despite his borderline

I.Q. and eighth-grade education, Mr. Bumgardner was able to answer questions in a competent manner and had little difficulty understanding what was asked of him."). Familiarity with the criminal process is a relevant circumstance to be weighed when considering the totality of the circumstances. *Kirk* at ¶ 25, citing *State v. Whisenant*, 127 Ohio App.3d 75, 87 (11th Dist.1998) (stating that a suspect's previous criminal experience is also a relevant circumstance). However, that Pickens did not have familiarity with the criminal process does not render his waiver invalid based on the *totality* of the other circumstances of this case.

{¶47} Yet, Pickens further contends that his waiver is invalid because Lieutenant Adkins de-emphasized the *Miranda* warnings by indicating to him that the *Miranda* warnings were a mere formality. However, we reject Pickens's argument because, even if Lieutenant Adkins tried to downplay the importance of the *Miranda* warning, Pickens was still fully cognizant of the warning's significance based on the totality of the circumstances we addressed above. *Compare State v. Quigley*, 11th Dist. Geauga No. 2004G-2577, 2005-Ohio-5276, ¶ 26, 29 (concluding that Quigley's Miranda waiver was valid despite law enforcement's attempt "to downplay the relative importance of his *Miranda* rights" by telling him "that the *Miranda* warnings had been given to him 'as a courtesy'" because Quigley "was still fully cognizant of the warning's significance"); *United States v. Barragan*, N.D.Iowa No. CR13-4018-MWB, 2013 WL 4606611, *7 (Aug. 27, 2013)

(concluding that Barragan waived his *Miranda* rights despite law enforcement telling him "that reading his rights was a 'formality'"), citing *United States v. Syslo*, 303 F.3d 860, 866 ("finding that *Miranda* waivers were not invalidated even if the officers had told suspects that signing the waivers was a formality after they went to the police station voluntarily, were informed they would be questioned and they agreed to answer").

**{¶48}** Accordingly, in light of the circumstances of this case, Pickens voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Kirk* at ¶ 36. *See also Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, at ¶ 13. Therefore, we conclude that Pickens validly waived his *Miranda* rights, and his statements to law enforcement were voluntary. Thus, the trial court did not err by admitting Pickens's January 15, 2016 statements into evidence.

**{¶49}** As such, the trial court did not err by denying Pickens's motion to suppress evidence. Pickens's first assignment of error is overruled.

### Assignment of Error No. II

**The Court Erred by Ruling that the Child Was Competent to Testify in this Case. As the Proponent of the Child Witnesses' [sic] Testimony, the State Did Not Meet its Burden of Proving the Child Was Capable of Receiving Just Impressions and Relating Them Truthfully.**

**{¶50}** In his second assignment of error, Pickens argues that the trial court erred in finding that the victim, R.D., was competent to testify at trial. Specifically,

he avers that the record fails to establish that R.D. is able to receive just impressions and relate them truthfully.

{¶51} Evid.R. 601 provides, in relevant part: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Evid.R. 601(A).

{¶52} "A trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify. In making this determination, the court must consider:

> (1) the child's ability to receive accurate impressions of fact or to
> observe acts about which he or she will testify, (2) the child's ability
> to recollect those impressions or observations, (3) the child's ability
> to communicate what was observed, (4) the child's understanding of
> truth and falsity and (5) the child's appreciation of his or her
> responsibility to be truthful."

*State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 100, quoting *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991). "It is well-settled that, as the trier of fact, trial judges are required to make a preliminary determination as to the competency of all witnesses, including children, and that absent an abuse of discretion, competency determinations of the trial judge will not be disturbed on appeal." *State*

*v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 52, citing *State v. Clark*, 71 Ohio St.3d 466, 469 (1994), citing *Frazier* at 251. "A trial court is given wide latitude in determining whether a prospective witness is competent to testify." *Id.*, citing *Clark* at 469-70. "'The trial judge has the opportunity to observe the child's appearance, manner of responding to questions, general demeanor, and ability to relate facts accurately and truthfully.'" *Id.*, quoting *Frazier* at 251.

**{¶53}** On June 2, 2016, the trial court conducted a hearing to determine R.D.'s competency to testify. (June 2, 2016 Tr. at 1). R.D. was nine years old when she testified at that hearing. (*Id.* at 15). During the voir dire examination to determine her competency, R.D. stated her birthday and that she lived with her parents and her sisters. (*Id.* at 15, 17). R.D. stated the ages of her sisters. (*Id.* at 17). She also recalled details from her ninth birthday party, including specific details about her birthday cake. (*Id.* at 15-17). R.D. was able to recall her last day of school and knew how many days she had been out of school for the summer. (*Id.* at 17). R.D. knew the name of the school she attends, which grade she completed, which grade she would be entering the next school year, and the names of her teachers. (*Id.* at 18-19). She identified the specific gifts she received at Christmas the year before. (*Id.* at 22).

**{¶54}** On appeal, Pickens directs us to R.D.'s answers from the competency hearing that he argues supports his claim that the trial court abused its discretion in

concluding that R.D. is competent to testify. The portions of the competency-hearing transcript that he refers us to are as follows:

[Trial Court]:    Now, how – how long have you lived on Kentucky Street?

[R.D.]:    Eighteen one years.

[Trial Court]:    Say that again?

[R.D.]:    Eighteen hundred years.

[Trial Court]:    Eighteen hundred years.

[R.D.]:    Um-hum.

[Trial Court]:    That sounds like a real long time.

[R.D.]:    Um-hum.

[Trial Court]:    Did you live someplace else before you lived on Kentucky Street?

[R.D.]:    Hmm –

[Trial Court]:    Or –

[R.D.]:    I don't – I don't know.

[Trial Court]:    Okay. So, now, you're – you're in a Courtroom, do you know that?

[R.D.]:    Um-hum.

[Trial Court]:    Have you been in here before?

[R.D.]:    No.

[Trial Court]: Okay.

Did they bring you in last week may be to –

[R.D.]: Yeah.

* * *

[Trial Court]: Your – your mother's here in Court, right? And you live with her? Okay. Did she talk to ya [sic] about comin [sic] in here today?

[R.D.]: -- (Inaudible) --

[Trial Court]: And did she give you any advice or tell you what you should say when you were in Court?

[R.D.]: Yes.

[Trial Court]: What did she tell you?

[R.D.]: All those things about Harold.

(*Id.* at 20, 22, 28). Notwithstanding those responses, after further inquiry from the trial court, R.D. provided the following responses demonstrating that she understood the concept of truthfulness and knew that there were consequences for not telling the truth:

[Trial Court]: Now, when we're in Court, it's real important that you tell the truth. Do you know what it means to tell the truth? That's kinda [sic] a hard word.

-31-

[R.D.].          Hmm.

               Tell the truth you won't get in trouble.

[Trial Court]:   So what happens if you don't tell the truth?

[R.D.]:          You'll get in trouble.

[Trial Court]:   Okay.

               How do you know that?

[R.D.]:          Because I'm smart.

* * *

[Trial Court]:   Now, if you're asked some questions in Court, will you tell the truth about what you're asked? Now, let me ask you kind of a silly question. If I said that I'm wearing a red robe, would that be the truth?

[R.D.]:          No.

[Trial Court]:   Okay.

               Why wouldn't it be the truth?

[R.D.]:          That would be a lie.

[Trial Court]:   And why would it be a lie?

[R.D.]:          Because it's not red.

[Trial Court]:   It's not red.

               What color is it?

[R.D.]:          Black.

[Trial Court]:   So if I said I was wearing a black robe, would that be the truth?

[R.D.]:          Yes.

[Trial Court]:   And if I was in Court and I had to take an oath or a promise to tell the truth and they asked me what color by [sic] robe is what should I say?

[R.D.]:          I promise I'll tell the truth.

[Trial Court]:   Okay.

                 And so let's say you were – had to promise to tell the truth and we asked ya [sic] what color by [sic] is, what would your answer be?

[R.D.]:          Your robe's black.

* * *

[Trial Court]:   Did [your mother] tell you whether you should tell the truth or not?

[R.D.]:          Truth.

[Trial Court]:   She said tell ya [sic] the – the truth?

                 Okay.  And by truth, what do you think that means?

> [R.D.]: When you tell the truth you'll be good and not be bad and you won't be – when you tell the truth you – you'll not be grounded or nothing.

(*Id.* at 23, 26-27, 29).

Regarding the incidents involving Pickens, the trial court had the following exchange with R.D.:

> [Trial Court]: Would you – would you go to his house sometimes?
>
> [R.D.]: Yeah
>
> And stay the night sometimes.
>
> [Trial Court]: Okay.
>
> Now, were there some things that happened at his house that you told people about?
>
> [R.D.]: Hmm.
>
> Well, we take a bath with each other. We leave our underwears on.
>
> [Trial Court]: Okay.
>
> You would – what, you say you would take a bath?
>
> [R.D.]: Yeah.
>
> [Trial Court]: And what, [Pickens] would help give you the bath? Or would he take a bath also?

[R.D.]:           I'll take a bath with him.

* * *

[Trial Court]:    Do you remember some ladies from Children Services talkin' [sic] to you?

[R.D.]:           Yes.

[Trial Court]:    Okay.

                  And did you tell them about what [Pickens] had done?

[R.D.]:           Hmm, yeah.

(*Id*. at 25-26).

{¶55} "The Supreme Court of Ohio has stated that 'a child may be competent to testify even though the child is unable to recollect some facts or initially does not recognize the concept of truth, so long as other answers demonstrate that the child can perceive and recall generally and understands the concept of truthfulness.'" *Spencer*, 2015-Ohio-52, at ¶ 55, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 76, citing *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439, ¶ 62 (finding the six-year-old witness competent even though she answered some questions incorrectly). *See also Prado v. Elsayed*, 2d Dist. Montgomery No. 24528, 2012-Ohio-290, ¶ 42 (stating that a child can be found competent to testify even when the child is initially "unable to recollect some facts or initially does not recognize the concept of truth, so long as the voir dire continues on to demonstrate

that the child can perceive and recall generally and understands the concept of truthfulness").

{¶56} Similar to child-victim in *Spencer*, although the record reflects that R.D. "seemed confused and had initial difficulty answering some of the specific questions posed by the trial court," the totality of the record reflects R.D. is able to receive just impressions and relate them truthfully. *Spencer* at ¶ 56. R.D.'s responses to other questions from the trial court demonstrate "that she knew the difference between truth and falsity and understood that she should tell the truth." *Id.* Therefore, we conclude that R.D. exhibited sufficient ability to receive, recall, and communicate accurate impressions of fact, understand truth and falsity, and appreciate the responsibility to tell the truth as required under Evid. R. 601(A). *Id.* Accordingly, the trial court did not abuse its discretion by finding R.D. competent to testify. Pickens's second assignment of error is overruled.

{¶57} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**