[Cite as *State v. Pasterchik*, 2023-Ohio-4252.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

MICHAEL T. PASTERCHIK,

    DEFENDANT-APPELLANT.

CASE NO. 1-22-50

O P I N I O N

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

MICHAEL T. PASTERCHIK,

    DEFENDANT-APPELLANT.

CASE NO. 1-22-51

O P I N I O N

Appeals from Allen County Common Pleas Court
Trial Court Nos. CR2020 0394 and CR2020 0410

Judgments Affirmed

Date of Decision: November 27, 2023

APPEARANCES:

    *Thomas J. Lucente, Jr.* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**MILLER, P.J.**

{¶1} Defendant-appellant, Michael T. Pasterchik ("Pasterchik"), appeals the July 28, 2022 judgments of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

*Background*

{¶2} On April 25, 2020, Pasterchik contacted law enforcement after he discovered Jennifer Moyer ("Moyer"), his roommate, dead in the bathtub of her home at 1204 Brower Road, Lima, Ohio. Later that day, Pasterchik was interviewed at the police station regarding the death of Moyer, but he was not arrested at that time. It was subsequently determined that Moyer died of a drug overdose.

{¶3} Law enforcement was dispatched on September 13, 2020 to 740 North Main Street, Lima, Ohio for a report of an unconscious woman. When officers arrived at the scene, they discovered Jessica Judy ("Judy") unresponsive from an apparent drug overdose. She was transported to the local hospital where she was subsequently pronounced dead. On October 16, 2020, Pasterchik was arrested for his involvement in the death of Judy and was interrogated at the Lima Police Department.

*Allen County Case Number CR2020 0410 (Jennifer Moyer)*

{¶4} On November 12, 2020, the Allen County Grand Jury indicted Pasterchik on two counts in Allen County case number CR2020 0410 in relation to the death of Moyer: Count One of trafficking in harmful intoxicants in violation of

R.C. 2925.32(A)(1), (D)(1), a fifth-degree felony, and Count Two of involuntary manslaughter in violation of R.C. 2903.04(A),(C), a first-degree felony. Pasterchik entered a written plea of not guilty on November 19, 2020.

*Allen County Case Number CR2020 0394 (Jessica Judy)*

{¶5} On December 17, 2020, the Allen County Grand Jury indicted Pasterchik on two counts in Allen County case number CR2020 0394 relating to the death of Judy: Count One of corrupting another with drugs in violation of R.C. 2925.02(A)(3), (C)(1), a first-degree felony, and Count Two of involuntary manslaughter in violation of R.C. 2903.04(A), (C), a first-degree felony. The following day, Pasterchik filed a written plea of not guilty.

*Trial*

{¶6} Pursuant to a motion filed by the State, the trial court consolidated the two cases for the purpose of trial. Following a trial held on July 26-28, 2022, the jury found Pasterchik guilty of all charges in both cases. The trial court accepted the jury's verdicts and found Pasterchik guilty.

{¶7} The trial court proceeded immediately to sentencing. In case number CR2020 0410, the trial court found that the counts merged. The State elected to proceed on Count Two (involuntary manslaughter), and Pasterchik was sentenced to an indefinite term of a minimum of 11 years and a maximum of 16 ½ years in prison on that charge. In case number CR2020 0394, the trial court again found the counts merged. The State elected to proceed on Count One (corrupting another with

drugs), and Pasterchik was sentenced to an indefinite term of a minimum of 11 years and a maximum of 16 ½ years in prison on that charge. The trial court ordered the sentences to be served consecutively for an aggregate minimum of 22 years and a maximum of 27 ½ years in prison. That same day, the trial court filed its judgment entries of conviction and sentence.

{¶8} Pasterchik filed his notices of appeal on August 22, 2022. He raises four assignments of error for our review.

### First Assignment of Error

**The trial court erred when it failed to suppress Defendant's statements to law enforcement officers.**

{¶9} In his first assignment of error, Pasterchik argues that the trial court erred by denying his two motions to suppress his statements to law enforcement officers.

{¶10} On December 28, 2020, Pasterchik filed a motion to suppress in case number CR2020 0410 seeking an order suppressing all statements made to law enforcement officers on April 25, 2020. Specifically, Pasterchik argued that officers failed to advise him of his *Miranda* rights despite the fact that he was allegedly in custody at the time he made statements to the officers.

{¶11} On November 12, 2021, Pasterchik filed a motion to suppress statements in case number CR2020 0394 arguing that the statements he made to Detective Sean Neidemire ("Det. Neidemire") on October 16, 2020 were

involuntary. Specifically, Pasterchik argued that although Det. Neidemire read him his *Miranda* rights at the onset of the interview, his statements should nonetheless be suppressed because he was under the influence of fentanyl at the time of the interview.

*Standard of Review: Motion to Suppress*

{¶12} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of the witnesses. *Id.* *See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*Applicable Law: Privilege Against Self-Incrimination*

{¶13} "The Fifth Amendment to the U.S. Constitution provides a privilege against self-incrimination." *State v. Edmond*, 10th Dist. Franklin No. 15AP-574, 2016-Ohio-1034, ¶ 11, citing *State v. Hall*, 179 Ohio App.3d 727, 2008-Ohio-6228, ¶ 12 (10th Dist.), citing *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136

(1984). "To protect this right, the United States Supreme Court has held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Id.*, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). "Thus, *Miranda* warnings are required when a suspect is subjected to custodial interrogation." *Id.*, citing *State v. Garnett*, 10th Dist. Franklin No. 09AP-1149, 2010-Ohio-5865, ¶ 30. "Custodial interrogation is defined in *Miranda* as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.*, quoting *Miranda* at 444.

*April 25, 2020 Interview (Case Number CR2020 0410)*

{¶14} We first address Pasterchik's argument that the trial court erred by failing to suppress his statements to Detective Matt Woodworth ("Det. Woodworth") on April 25, 2020. The trial court denied Pasterchik's motion to suppress evidence after concluding Pasterchik was not in custody for purposes of the April 25, 2020 interview at the police station. Accordingly, the trial court found Det. Woodworth was not required to give Pasterchik *Miranda* warnings prior to the interview.

{¶15} In its judgment entry denying Pasterchik's motion to suppress, the trial court determined that Pasterchik was not in custody during his law enforcement

-6-

interactions on April 25, 2020. In so finding, the trial court held that "[t]he evidence shows nothing contrary to a finding that defendant voluntarily agreed to be questioned by [Det.] Woodworth, and did not object to being transported in a police cruiser." (Case No. CR2020 0410, Doc. No. 30). The trial court further reasoned that "[u]nder the facts of this case, the Court decides that on April 25, 2020 defendant could not have objectively or reasonably understood that he was in custody, or that he was likely to remain in custody for more than a short period of time." (*Id.*).

The trial court concluded:

> Considering the totality of the circumstances in this case, the Court finds the State has proven the defendant was not in custody, voluntarily agreed to speak to [Det.] Woodworth and, thus, that it was not necessary that he be given the warnings of *Miranda*. Defendant understood the nature of the investigation and the questions asked. There was no coercion, threats or promises by officers. After the interview, defendant was allowed to leave.

(*Id.*).

**{¶16}** Our review of the record, including the suppression-hearing transcript and the interview video, reveals that the trial court's factual findings regarding the April 25, 2020 interview are supported by competent, credible evidence. *See State v. Luke*, 3d Dist. Allen No. 1-06-103, 2007-Ohio-5906, ¶ 12.

**{¶17}** "In determining whether an interrogation is custodial, courts must inquire into "'how a reasonable man in the suspect's position would have understood his situation.'"" *State v. Woodward*, 3d Dist. Hancock No. 5-18-21,

2019-Ohio-908, ¶ 17, quoting *State v. Mason*, 82 Ohio St.3d 144, 153 (1988), quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138 (1984). "The Supreme Court of Ohio has directed that, '[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a "reasonable person would have believed that he was not free to leave."'" *Id.*, quoting *State v. Gumm*, 73 Ohio St.3d 413, 429, 1995-Ohio-24, quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980). "Whether a person is in custody for *Miranda* purposes depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *In re A.M.*, 3d Dist. Marion No. 9-20-23, 2021-Ohio-432, ¶ 29, citing *Stansbury v. California*, 511 U.S. 318, 323-324 (1994).

{¶18} "Relevant factors to consider in determining whether a custodial interrogation took place are: (1) the location of the questioning; (2) duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints; and (5) whether the interviewee was released at the end of the interview." *In re R.S.*, 3d Dist. Paulding No. 11-13-10, 2014-Ohio-3543, ¶ 17, citing *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012).

{¶19} At the suppression hearing, Det. Woodworth testified he was called to 1204 Brower Road on April 25, 2020 to investigate a deceased body found at the residence. (Mar. 8, 2021 Tr. at 6). When Det. Woodworth arrived on the scene, he was advised that Pasterchik, a resident of the home, found Moyer's body. (*Id.*).

-8-

According to Det. Woodworth, Pasterchik was driven in a police cruiser from the scene to the Lima Police Department to give a statement regarding "what he had found." (*Id.* at 6-7).

**{¶20}** When Det. Woodworth completed his tasks at the Brower Road scene, he arrived at the Lima Police Department to interview Pasterchik. (*Id.* at 8). According to Det. Woodworth, he interviewed Pasterchik in one of the interrogation rooms at the police station. (*Id.* at 13-14). Det. Woodworth stated that he shut the door of the room while interviewing Pasterchik, but did not lock the door. (*Id.*).

**{¶21}** During the interview, Det. Woodworth questioned Pasterchik about the events of April 24-25, 2020. (*Id.* at 14-15). Det. Woodworth stated that he did not Mirandize Pasterchik at any time during or prior to the interview because Pasterchik was not in custody. (*Id.* at 7-8). According to Det. Woodworth, Pasterchik was free to leave at any time during the interview, although he did not explicitly state that to Pasterchik. (*Id.* at 9, 14). Nonetheless, at the conclusion of the interview, Pasterchik left the Lima Police Department and went home. (*Id.* at 9). Det. Woodworth testified that Pasterchik was not a suspect at the time that he was at the station. (*Id.* at 10).

**{¶22}** State's Exhibit 1, a recording of the April 25, 2020 interview, was admitted by stipulation. (Mar. 8, 2021 Tr. at 4-5). The recording, which is approximately one hour and nine minutes in duration, is consistent with Det. Woodworth's testimony. (State's Ex. 1). State's Exhibit 1 depicts Pasterchik in an

interview room without any type of restraints smoking a cigarette. (*Id.*). Det. Woodworth offers Pasterchik something to drink, which he declines. (*Id.*). Although Det. Woodworth closes the door behind him when he enters the room, in the recording, it appears to be slightly ajar. (*Id.*).

{¶23} Det. Woodworth explains to Pasterchik that the interview is being recorded, and informs Pasterchik that the purpose of the interview is to determine "what happened" to Moyer. (State's Ex. 1). Pasterchik then answers Det. Woodworth's questions about the events of April 24-25, 2020 and about Moyer's drug use. (*Id.*). During the interview, Det. Woodworth asked to see Pasterchik's arms and chest to check for scrapes. (*Id.*). Pasterchik willingly complied, including lifting his shirt for Det. Woodworth to inspect his chest. (*Id.*).

{¶24} Midway through the interview, Det. Woodworth leaves the room for a period of time. (*Id.*). During the approximately 30 minutes that Pasterchik is left alone in the interview room, he does not try to get up or leave the room. (*Id.*). When Det. Woodworth reenters the room, he leaves the door halfway open, and they continue the conversation. (*Id.*). When Det. Woodworth asks Pasterchik what questions he has, Pasterchik inquires about the next steps. (*Id.*). Det. Woodworth then informs Pasterchik that he can leave. (*Id.*). In response, Pasterchik asks Det. Woodworth if he has "time for one more [cigarette]?" (*Id.*). Det. Woodworth tells him he can stay and smoke another cigarette, and Pasterchik remains in the room,

with the door slightly ajar, smoking a cigarette, for approximately five minutes. (*Id.*).

**{¶25}** Throughout the interview, the tone of the conversation is casual and congenial. (State's Ex. 1). Pasterchik appears to be forthcoming and willing to talk to Det. Woodworth. (*Id.*). At no point does Det. Woodworth raise his tone of voice. (*Id.*). Pasterchik appears relaxed and comfortable when talking to the detective. (*Id.*).

**{¶26}** Weighing the totality of the trial court's findings regarding whether Pasterchik was in custody on April 25, 2020, we conclude that a reasonable person in Pasterchik's position would believe that he was free to leave. *See Luke*, 2007-Ohio-5906, ¶ 13, citing *State v. Greeno*, 3d Dist. Seneca No. 13-02-46, 2003-Ohio-3687, ¶ 15.

**{¶27}** In support of his position that he was in custody, Pasterchik relies on two facts: (1) the interview took place at the Lima Police Department and (2) Pasterchik arrived at the Lima Police Department in a police cruiser. As this court has previously held, "a noncustodial situation is not converted into a custodial situation simply because questioning takes place in a police station." *In re A.M.*, 2021-Ohio-432, at ¶ 28, citing *Oregon v. Mathiason*, 429 U.S. 492 (1977). Indeed, the record indicates Pasterchik voluntarily accompanied the law enforcement officers to the police station. *See State v. Pickens*, 3d Dist. Marion No. 9-16-35, 2017-Ohio-1231, ¶ 36. Furthermore, "a person is not in custody simply because

they are transported to the police station by a police officer." *State v. Smith*, 12th Dist. Fayette No. CA20060-08-030, 2009-Ohio-197, ¶ 12. *See State v. Fahl*, 2d Dist. Clark No. 2005-CA-98, 2006-Ohio-1809, ¶ 3 ("*Miranda* warnings are not required simply because the questioning takes place in the police station and the questioned person is a suspect."). "This is especially true when the person is free to leave at any time." *Smith* at ¶ 12. *See Pickens* at ¶ 35, quoting *State v. Brantley*, 9th Dist. Wayne No. 27466, 2016-Ohio-4680, ¶ 63 ("'We are mindful that the United States Supreme Court has stated that questioning of a suspect at a police station does not inherently require a conclusion that the defendant was in custody[.]'"). Here, the circumstances of the case indicate that Pasterchik's freedom was not restricted. The fact Pasterchik was transported by law enforcement to the police station for an interview does not automatically mandate the need to read a suspect his *Miranda* rights prior to questioning.

*October 16, 2020 Interview (Case Number CR2020 0394)*

**{¶28}** We next address Pasterchik's argument that the trial court erred by failing to suppress his statements to Det. Neidemire on October 16, 2020. Following a suppression hearing on December 20, 2021, the trial court found that the *Miranda* warnings Det. Neidemire gave Pasterchik were sufficient. Further, the trial court found that even though Pasterchik stated that he had used fentanyl earlier in the day, he was still sober enough to understand what he was doing and saying throughout the interview.

{¶29} On appeal, Pasterchik does not challenge the sufficiency of the contents of his admonishments. Rather, he argues that, due to his fentanyl usage, his waiver was not knowing, intelligent, and voluntary.

{¶30} In its December 23, 2021 judgment entry denying Pasterchik's motion to suppress, the trial court aptly addressed the issue of Pasterchik's use of fentanyl and its potential impact on his waiver of his right against self-incrimination. The court found as follows:

> During the interrogation, defendant appeared to have full control of his reasoning abilities and, even though there was evidence that defendant had used fentanyl before he was arrested, he did not give the impression by his behavior, manner of speech or demeanor as demonstrated by the DVD (Exhibit #2) that he was intoxicated. Defendant talked about what happens to him when the drugs wear off and how he usually withdraws. At the end of the interrogation, defendant said he was sober enough to understand what he was doing and saying. He answered Neidemire's questions consistently and in detail. He also recalled the course of events regarding his selling drugs to [Judy] and what happened after he learned that [Judy] died. Despite the fact that defendant said he had used drugs, Neidemire testified that defendant showed no sign of being high and showed no sign of withdrawal.

(Case No. CR2020 0394, Doc. No. 53).

{¶31} A suspect may knowingly and intelligently waive his *Miranda* rights and agree to make a statement. *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34, citing *Miranda*, 384 U.S. at 479. "If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *Id.*, citing *Miranda* at 475 and *Colorado*

*v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515 (1986). "To determine whether a valid waiver occurred, we 'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *Id.* at ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, and citing *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246 (1991).

**{¶32}** Here, Pasterchik's only argument that his waiver was not knowing, intelligent, and voluntary is that he admitted to using fentanyl earlier in the morning, prior to his arrest. Pasterchik argues that Det. Neidemire could have waited a few days to ensure "Pasterchik had a clear mind before being interrogated." (Appellant's Brief at 9). Pasterchik speculates that "the detective was likely counting on [him] still being under the influence of the drugs so he could more easily get an incriminating statement from him." (*Id.*).

**{¶33}** The record belies Pasterchik's claims.

**{¶34}** At the suppression hearing, Det. Niedemire, testified he conducted an hour-long interview with Pasterchik on October 16, 2020. (Dec. 20, 2021 Tr. at 5).

**{¶35}** Det. Neidemire testified that he has 23 years of experience in law enforcement and that prior to his current assignment with the Detective Bureau, he was assigned to the Drug Task Force, which focuses on investigating drug-related crimes. (*Id.* at 3-4). Det. Neidemire also has a decade of experience working patrol.

(*Id.* at 5). Det. Neidemire testified that through his experience working patrol and with the drug task force, he is able to recognize the signs of impairment with fentanyl such as lethargy, glassy eyes, slurred speech, being very slow, and having difficulty staying awake. (*Id.* at 5-6). Det. Neidemire testified that he did not observe any of these signs of impairment during the interview. (*Id.* at 6). Furthermore, Det. Neidemire is familiar with the signs of fentanyl withdrawal, and he did not observe any signs of withdrawal during his interview with Pasterchik. (*Id.*). During cross examination, Det. Neidemire recalled that Pasterchik first informed him during the last five minutes of the interview, at approximately 1:00 p.m., that he had used fentanyl earlier that day at approximately 7:45 a.m. (*Id.* at 7).

{¶36} Pursuant to stipulation, State's Exhibit 1 and State's Exhibit 2 were admitted as evidence. State's Exhibit 1 is the admonishment form that was signed by Pasterchik on October 16, 2020 and witnessed by Det. Neidemire. (Dec. 20, 2021 Tr. at 2-3). State's Exhibit 2 is a recording of the interview conducted by Det. Neidemire on the same date. (Dec. 20, 2021 Tr. at 2-3). The recording, which is approximately 1 hour and 20 minutes in duration, is consistent with Det. Neidemire's testimony. (State's Ex. 2). State's Exhibit 2 depicts Pasterchik alone in the interview room smoking a cigarette. (*Id.*). Shortly thereafter, Det. Neidemire enters the room and introduces himself. (*Id.*). After asking Pasterchik some basic questions regarding his educational history, Det. Neidemire reads Pasterchik his

*Miranda* rights. (*Id.*). During this time, Pasterchik appears to be engaged and is reading along. (*Id.*). Pasterchik indicates that he understands the admonishment, and then he signs the form and indicates that he will talk to Det. Neidemire. (*Id.*).

{¶37} Pasterchik discusses his history of drug use and persons he associated with in the past. (*Id.*). Then, they discussed the death of Judy. (*Id.*). Pasterchik answers Det. Neidemire's questions regarding his interactions with Judy, particularly in the day before her death. (*Id.*).

{¶38} At the end of the interview, Det. Neidemire and Pasterchik discuss Pasterchik's past and current drug use. (*Id.*). Pasterchik stated that he uses fentanyl approximately three to four times a day, but that he did not have any on his person when he was arrested earlier that day because he finished it around 7:30 a.m., right before he started work. (*Id.*). Pasterchik stated that he was not currently feeling the effects of the fentanyl and denied that he was "under the influence." (*Id.*). Shortly thereafter, the interview concluded. (*Id.*).

{¶39} As this court has previously held, "intoxication, unto itself, is insufficient to render a statement per se inadmissible." *State v. Woodward*, 3d Dist. Hancock No. 5-18-21, 2019-Ohio-908, ¶ 20. "Rather, the presence of drugs or alcohol should be considered, but the amount must sufficiently impair the confessor's abilities to reason." *Id.*

{¶40} The trial court determined the testimony and evidence produced did not show that Pasterchik was intoxicated such that his ability to reason was

sufficiently impaired. In our own review of the matter, giving deference to the trial court's factual findings, but reviewing the legal issues de novo, we agree with the trial court's determination.

{¶41} Based on the record before us, we do not find the trial court erred by overruling Pasterchik's motion to suppress.

{¶42} Pasterchik's first assignment of error is overruled.

### Third Assignment of Error

**The Defendant's right to due process of law was violated inasmuch as the convictions were based on insufficient evidence.**

### Second Assignment of Error

**The convictions were against the manifest weight of the evidence and contrary to law.**

{¶43} For ease of discussion, we address Pasterchik's second and third assignments of error together and in reverse order. In his third assignment of error, Pasterchik argues that his convictions are supported by insufficient evidence. In his second assignment of error, Pasterchik argues that his convictions are against the manifest weight of the evidence. For the reasons that follow, we disagree.

{¶44} With respect to the death of Judy, at trial, Dr. Cynthia Beisser ("Dr. Beisser"), the forensic pathologist who supervised Judy's autopsy, testified that Judy's cause of death was a combined drug toxicity of fentanyl and heroin. (July 26-28, 2022 Tr. at 360). (*See* State's Ex. 54). Dr. Beisser interpreted the toxicology results of the substances found in Judy's blood and urine at the time of her death

and testified that the substances found are consistent with heroin and fentanyl usage. (July 26-28, 2022 Tr. at 353-354). Dr. Beisser testified that the ratio of fentanyl to norfentanyl (a metabolite of fentanyl) found in Judy's blood could have two explanations: (1) some time had passed between Judy's ingestion of fentanyl and her death or (2) Judy used more than one dosage of fentanyl. (*Id.* at 362-363). (*See* State's Ex. 54).

{¶45} Nicholas Voress ("Voress"), Judy's boyfriend at the time of her death, testified that on September 12, 2020, he drove Judy to purchase heroin from someone named "Mikey". (July 26-28, 2022 Tr. at 246-247). When they arrived at the meet up location, Judy got out of the car and met "Mikey" in an alley and when she returned to the vehicle, she had heroin with her. (*Id.* at 247-248). According to Voress, when they returned to Judy's residence, they snorted some of the drugs they purchased from "Mikey." (*Id.* at 248-249, 259). However, there were still some drugs remaining. (*Id.*). Voress stated that he and Judy spent the rest of the evening socializing with Judy's parents. (*Id.* at 249). As Voress and Judy headed upstairs to bed, Judy vomited. (*Id.*). When they finally arrived upstairs, Voress quickly "passed out" on the bed. (*Id.* at 249-250). Voress testified that he believes that Judy attempted to wake him up at some point during the night to do another line of heroin; however, he did not fully awake. (*Id.* at 250). In the early morning hours of September 13, 2020, Voress woke but found Judy not breathing and unresponsive.

(*Id.* at 251). Shortly thereafter, Voress called for emergency medical services, and Judy was prounounced dead shortly thereafter at the hospital. (*Id.* at 251-253).

**{¶46}** State's Exhibit 44, a forensic extraction of Judy's phone, includes Facebook Messenger conversations between Judy and Pasterchik on September 12, 2020 relating to meeting up with Pasterchik to make a purchase from him. (*Id.* at 295-296). (*See* State's Ex. 44). In State's Exhibit 50, a video recording of an October 16, 2020 interview of Pasterchik by Det. Neidemire, Pasterchik admitted to selling fentanyl to Judy in the alley described by Voress on September 12, 2020. (July 26-28, 2022 Tr. at 314-316); (State's Ex. 50). Pasterchik stated that he "assum[ed]" that Judy knew that the substance she purchased from him was fentanyl. (State's Ex. 50).

**{¶47}** With respect to the death of Moyer, Terri Ley ("Ley"), Moyer's grandmother, testified that she drove Moyer to Marblehead, Ohio on April 24, 2020 so Moyer could visit her children. (July 26-28, 2022 Tr. at 154-155). Ley stated that she picked up Moyer at approximately 11 a.m. from her home on Brower Road and Ley and Moyer arrived in Marblehead at approximately 1 p.m. (*Id.* at 155-157). According to Ley, once they arrived at Marblehead, the family went to the lake, and Moyer spent the day with her children. (*Id.* at 157). Ley stated that once she arrived at Marblehead, Moyer did not have contact with anyone other than her family. (*Id.*). Ley denied that there was any opportunity for Moyer to have procured drugs in

Marblehead, and Ley stated that Moyer did not know anyone in Marblehead aside from her family. (*Id.*).

{¶48} According to Ley, she and Moyer left Marblehead at approximately 8 p.m. (*Id.* at 158). Ley testified she observed Moyer texting someone on the drive back to Lima. (*Id.* at 159). Ley recalled that when she dropped Moyer off at her house on Brower Road in Lima, Ohio at approximately 10 p.m., the house was dark and Moyer's car was not in the driveway. (*Id.* at 158-159). Moyer told her that Pasterchik was staying at the house and took her car to Meijer "to get some supplies." (*Id.* at 159).

{¶49} Det. Woodworth testified that he responded to 1204 Brower Road on April 25, 2020 to investigate a report of a deceased person. (July 26-28, 2022 Tr. at 205-206). When he arrived at the residence, he observed Moyer, deceased, in the bathtub. (*Id.* at 207-208). In the bathroom with Moyer were a grocery bag, three cans of Dust Off, and Dust Off packaging. (*Id.* at 208). Also located in the bathroom with Moyer's body was a receipt from Meijer dated April 24, 2020. (*Id.* at 209); (State's Ex. 26). Using the information from the receipt, law enforcement was able to obtain surveillance images from Meijer at the time the transactions took place. (July 26-28, 2020 Tr. at 216); (State's Exs. 36, 37). The images depict Pasterchik at Meijer purchasing Dust Off. (July 26-28, 2022 Tr. at 217-218); (State's Exs. 36, 37). Additionally, State's Exhibit 35, a forensic download of

Moyer's phone, includes text messages between Moyer and "Mikey" regarding the purchase of Dust Off. (July 26-28, 2022 Tr. at 294-295); (State's Ex. 35).

{¶50} Additionally, State's Exhibit 34, a recording of Pasterchik's April 25, 2020 interview with Det. Woodworth, depicts Pasterchik admitting to Det. Woodworth that he purchased Dust Off for Moyer, at her request, on the evening before she died. (State's Ex. 34). Furthermore, Pasterchik stated that he knew that Moyer used Dust Off to get high and that he had previously observed her abusing Dust Off in ways that concerned Pasterchik. (*Id.*).

{¶51} Dr. Beisser, the forensic pathologist who performed Moyer's autopsy, stated that Moyer's death was the result of a combined drug toxicity of fentanyl and difluoroethane, a propellant used in aerosol cans such as Dust Off. (July 26-28, 2022 Tr. at 339-340, 342, 344); (State's Ex. 52). According to Dr. Beisser, the ratio of substances found in Moyer's blood indicates that fentanyl was taken near the time of Moyer's death. (July 26-28, 2022 Tr. at 341); (State's Ex. No. 52). Dr. Beisser testified that because both of the substances (fentanyl and difluoroethane) were found in Moyer's blood, her cause of death was a "combined drug toxicity" of fentanyl and difluoroethane. (July 26-28, 2022 Tr. at 342, 344). Dr. Beisser stated that she is unable to conclusively determine which of the substances caused Moyer's death. (*Id.* at 359).

{¶52} In State's Exhibit 39, a recording of Pasterchik's October 28, 2020 interview with Det. Woodworth, Pasterchik stated that although he knew that Moyer

used the Dust Off on April 24, 2020, to the best of his knowledge, Moyer did not use fentanyl that evening. (State's Ex. 39). Pasterchik, who admitted to supplying Moyer with fentanyl in exchange for Moyer allowing him to live in her home, stated that Moyer "easily" could have gotten into his fentanyl stash. (*Id.*). According to Pasterchik, Moyer never had to pay him for fentanyl and that Moyer had "open access" to his fentanyl supply. (*Id.*). Pasterchik stated, "If I had it, it was hers." (*Id.*).

*Standards of Review*

**{¶53}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997), *superseded by statute on other grounds, State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, we address each legal concept individually.

**{¶54}** """[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *Id.* at 386, quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as*

*recognized in Smith.* Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶55} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

-23-

*Applicable Law*

**{¶56}** As an initial matter, we note that Pasterchik's arguments with respect to the sufficiency of the evidence and the manifest weight of the evidence are brief and general in nature. Accordingly, it is not clear from his appellate brief to which counts Pasterchik is attempting to assign error. However, to the extent Pasterchik is attempting to assign error to Count Two, involuntary manslaughter, in case number CR2020 0394, or Count One, trafficking in harmful intoxicants, in case number CR2020 0410, we need not address those arguments because those counts were merged with the other count in their respective indictments. *See State v. Miller*, 3d Dist. Logan No. 8-19-02, 2019-Ohio-4121, ¶ 11. "'When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless' beyond a reasonable doubt." *Id.*, quoting *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14. Accordingly, error, if any, with respect to the sufficiency or weight of the evidence supporting Pasterchik's involuntary-manslaughter conviction in case number CR2020 0394 or trafficking-in-harmful-intoxicants conviction in case number CR2020 0410, is harmless beyond a reasonable doubt because those counts merged with corrupting another with drugs and involuntary manslaughter, respectively. Therefore, we will only address the sufficiency and weight of the evidence for

-24-

corrupting another with drugs in case number CR2020 0394 and involuntary manslaughter in case number CR2020 0410. *See Ramos* at ¶ 13, 18.

**{¶57}** We will first address the sufficiency of the evidence supporting Pasterchik's convictions.

**{¶58}** In case number CR2020 0394, relating to the death of Judy, Pasterchik was convicted of corrupting another with drugs in violation of R.C. 2925.02(A)(3). The offense of corrupting another with drugs is codified under R.C. 2925.02, which provides, in pertinent part:

> (A)(3) No person shall knowingly * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person * * *.

**{¶59}** The offense of corrupting another with drugs is a first-degree felony "if the offense is a violation of [R.C. 2925.03(A)(3)] and the drug involved is any compound, mixture, preparation, or substance included in schedule I or II." R.C. 2925.02(C)(1). Furthermore, "[i]f the offense was committed in the vicinity of a school, corrupting another with drugs * * * is a felony of the first degree and * * * the court shall impose as a mandatory prison term a first degree felony mandatory prison term." R.C. 2925.02(C)(1)(b).

**{¶60}** "Furnish" means "'[t]o supply, provide, equip, for accomplishment of a particular purpose.'" *State v. Haynes*, 6th Dist. Wood Nos. WD-18-087 and WD-18-088, 2020-Ohio-1049, ¶ 30, quoting *State v. Schwab*, 4th Dist. Athens No.

12CA39, 2014-Ohio-336, ¶ 9. Heroin is a schedule I controlled drug and fentanyl is a schedule II controlled drug. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶61} In case number CR2020 0410, in relation to the death of Moyer, Pasterchik was convicted of involuntary manslaughter in violation of R.C. 2903.04(A). This statute provides, in pertinent part, "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A).

{¶62} In this case, the underlying predicate offenses underlying Pasterchik's involuntary-manslaughter conviction were trafficking in harmful intoxicants or trafficking in fentanyl. R.C. 2925.32, which codifies the offense of trafficking in harmful intoxicants, provides, in relevant part, that "[n]o person shall knowingly dispense or distribute a harmful intoxicant to a person age eighteen or older if the person who dispenses or distributes it knows or has reason to believe that the harmful intoxicant will be used in violation of [R.C. 2925.31]." R.C. 2925.31(A) states, in relevant part, "no person with purpose to induce intoxication or similar physiological effects, shall obtain, possess, or use a harmful intoxicant."

{¶63} R.C. 2925.03, which codifies the offense of trafficking in fentanyl, provides in pertinent part, that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance or a controlled substance analog." R.C. 2925.03(A)(1).

*Analysis: Sufficiency of the Evidence*

**{¶64}** In his appellate brief, Pasterchik argues generally that "there was very little evidence presented that [he] was responsible for these deaths." (Appellant's Brief at 14). Pasterchik argues that the "medical examiner could not precisely tell what killed the two victims and it could very easily have been other substances that did not come from Mr. Pasterchik." (*Id.*).

**{¶65}** However, Pasterchik's arguments relate to the weight of the evidence rather than the sufficiency of the evidence. To the extent that Pasterchik is attempting to argue that the State presented insufficient evidence that Pasterchik provided the victims with the substances that led to their deaths, we disagree.

**{¶66}** With respect to the death of Judy, the State presented sufficient evidence that, if believed, could allow a trier of fact to find that Pasterchik supplied Judy with the substance that resulted in her death. Specifically, Voress testified that he and Judy met up with "Mikey" to purchase heroin on September 12, 2020. Notably, Pasterchik admitted that he sold Judy drugs on that date. Pasterchik stated that the substance that he sold Judy was fentanyl and he "assume[d]" that she knew the substance was fentanyl. Furthermore, Voress stated that he and Judy used some of the drugs they purchased immediately after returning to Judy's residence.

**{¶67}** With respect to the death of Moyer, the forensic pathologist stated that her death was the result of a combination of difluoroethane and fentanyl. In his April 25, 2020 interview with Det. Woodworth, Pasterchik admitted he purchased

Dust Off for Moyer on April 24, 2020 and that he knew that she used the Dust Off to get high. Moreover, in his October 28, 2020 interview with Det. Woodworth, Pasterchik admitted that he regularly provided Moyer with fentanyl in exchange for her allowing him to live in her home. Pasterchik stated that Moyer knew the location of his fentanyl stash and that she had open access to any fentanyl that he had.

{¶68} Accordingly, we find that the State presented sufficient evidence from which the jury could find that Pasterchik provided Judy and Moyer with the substances that resulted in their deaths. We further find that Pasterchik's convictions are supported by sufficient evidence.

{¶69} Pasterchik's third assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶70} In support of his argument that his involuntary manslaughter conviction is against the manifest weight of the evidence, Pasterchik alleges that no conclusive evidence was presented to show that Dust Off caused Moyer's death. Pasterchik concedes that he purchased Dust Off for Moyer on April 24, 2020. However, he contends that because the autopsy and toxicology reports indicate that fentanyl and difluorethane were present in Moyer's blood at the time of her death, and the forensic pathologist could not conclusively determine which substance killed Moyer, his conviction is against the manifest weight of the evidence.

{¶71} We disagree. As addressed in our discussion of the sufficiency of the evidence, Dr. Beisser testified that Moyer's death was the result of a combined drug

toxicity of fentanyl and difluoroethane. Pasterchik argues that although he purchased the Dust Off for Moyer, the forensic pathologist could not conclusively determine whether the difluoroethane or the fentanyl, or some combination thereof, killed Moyer. Although Pasterchik maintained that he was not aware of Moyer using fentanyl the night of her death, he admitted he supplied Moyer with fentanyl on a regular basis in exchange for living in her home and that she had open access to the fentanyl present in the residence. Pasterchik specifically stated that Moyer "easily" could have used his supply of fentanyl. Moreover, Ley, Moyer's grandmother who was with Moyer during the day and evening hours of April 24, 2020, stated that Moyer would not have had the opportunity to meet up with anyone in Marblehead to purchase drugs. Accordingly, we do not find that Pasterchik's involuntary-manslaughter conviction is against the manifest weight of the evidence.

{¶72} In support of his argument that his corrupting-another-with-drugs conviction is against the manifest weight of the evidence, Pasterchik argues that Dr. Beisser's testimony "makes it unclear what drug killed [Judy] and when it was taken and where and when she got it." (Appellant's Brief at 11). We disagree.

{¶73} Dr. Beisser testified that the substances found in Judy's blood and urine at the time of her death are consistent with heroin and fentanyl usage. She also testified that the ratio of fentanyl to norfentanyl found in Judy's blood at the time of her death could have two explanations: (1) some time had passed between her ingestion of fentanyl and her death or (2) Judy used more than one dosage of

fentanyl. After reviewing the record, we find that the evidence presented at trial is consistent with either possibility.

**{¶74}** Voress testified that he and Judy purchased fentanyl from "Mikey" on September 12, 2020, and in his October 16, 2020 interview with Det. Neidemire, Pasterchik admitted that he sold fentanyl to Judy on that day. Voress stated that when he and Judy returned to her residence after purchasing the drugs, they immediately used some of the drugs, but that there were still some of the purchased drugs remaining. Voress recalled that he and Judy spent the evening socializing with her family, and then they all went to bed. However, Voress stated that he recalls Judy attempting to wake him up during the night. Although he assumed that Judy tried to wake him up to do another line of drugs together, Voress did not fully awake until several hours later when he found Judy unresponsive. Accordingly, both explanations provided by Dr. Beisser for the ratio of fentanyl to norfentanyl found in Judy's blood are consistent with the testimony. Accordingly, we do not find Pasterchik's corrupting-another-with-drugs conviction is against the manifest weight of the evidence.

**{¶75}** Pasterchik's second assignment of error is overruled.

### Fourth Assignment of Error

**Defendant was denied the effective assistance of counsel as required by the Sixth Amendment to the U.S. Constitution.**

**{¶76}** In his fourth assignment of error, Pasterchik summarily argues he "was denied the effective assistance of counsel when his attorney failed to present any evidence to try to instill reasonable doubt." (Appellant's Brief at 15). However, Pasterchik offers no indication what evidence should have been presented to support a defense. Nor is there any argument explaining why defense counsel's decision to only challenge the State's case through cross examination of its witnesses was an improper strategy.

**{¶77}** "'[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal.'" *State v. Costell*, 3d Dist. Union No. 14-15-11, 2016-Ohio-3386, ¶ 86, quoting *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7. If an argument exists that can support an assignment of error, it is not this court's duty to root it out. *State v. Shanklin*, 3d Dist. Union No. 14-13-23, 2014-Ohio-5624, ¶ 31.

**{¶78}** "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the

contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7). Here, not only did Pasterchik fail to include an argument regarding how specifically his trial counsel's performance was deficient and how he was prejudiced by the deficiency, he also failed to provide citations to authorities, statutes, and parts of the record in support of his argument. Thus, we need not address Pasterchik's argument that his trial counsel was ineffective.

{¶79} Consequently, Pasterchik's fourth assignment of error is overruled.

*Conclusion.*

{¶80} For the foregoing reasons, Pasterchik's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the Allen County Court of Common Pleas.

***Judgments Affirmed.***

**ZIMMERMAN and POWELL, J.J., concur.**

/hls

**\*\* Judge Stephen W. Powell of the Twelfth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**